# LEOVY v. UNITED STATES.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

No. 238.   Argued April 12, 16, 1900.—Decided May 14, 1900.

Subject to the paramount jurisdiction of Congress over the navigable waters of the United States, the State of Louisiana had, under the act of March 2, 1849, c. 87, and the other statutes referred to in the opinion of the court, full power to authorize the construction and maintenance of levees, drains and other structures necessary and suitable to reclaim swamp and overflowed lands within its limits.

The dam constructed by the plaintiff in error at Red Pass was constructed under the police power of the State, and within the terms and purpose of the grant by Congress.

The decision of the jury, to whom it had been left to determine whether the plaintiff in error was guilty, that the pass was in fact navigable, is not binding upon this court.

The term navigable waters of the United States has reference to commerce of a substantial and permanent character to be conducted thereon.

The defendant below was entitled to the instruction asked for, but refused, that the jury should be satisfied from the evidence that Red Pass was, at the time it was closed, substantially useful to some purpose of interstate commerce, as alleged in the indictment.

Upon the record now before the court it is held that Red Pass, in the condition it was when the dam was built, was not shown by adequate evidence to have been a navigable water of the United States, actually used in interstate commerce, and that the court should have charged the jury, as requested; that upon the whole evidence adduced, the defendants were entitled to a verdict of acquittal.

AT the April term of the Circuit Court of the United States for the Eastern District of Louisiana an indictment was found, charging Augustus F. Leovy and Robert S. Leovy, both of the parish of Plaquemines, State of Louisiana, with, on the 16th of November, 1895, unlawfully, wilfully, knowingly and without permission of the Secretary of War, building and causing to be built a dam in and across a certain navigable stream of the United States known as Red Pass, and outside of any established harbor lines, which said Red Pass flows in the Gulf of Mexico from a certain navigable stream of the United States, known as the Jump, which said Jump is an outlet of the Mississippi River into the Gulf of Mexico; that said dam has been continued by the defendants since the same was built, and still remains in and across said Red Pass, whereby the navigation of and commerce over and through Red Pass was then and there, and has been ever since, impaired and obstructed; they, the said defendants, well knowing the said Red Pass to be a navigable stream of the United States, in respect of which the United States then and there had jurisdiction, contrary to the form of the statute of the United States in such case made and provided, and against the peace and dignity of the United States.

The defendants entered a plea of not guilty; and the cause was tried before the district judge, and a jury. The trial resulted, June 6, 1891, in a verdict of not guilty as to Augustus F. Leovy, and of guilty as to Robert S. Leovy; whereupon it was adjudged that said Robert S. Leovy pay a fine of two hundred dollars and costs of prosecution.

Several bills of exception on behalf of Robert S. Leovy were seasonably presented, and signed and allowed by the trial judge, who, likewise, on, June 16, 1898, allowed a writ of error, and the cause was taken to the United States Circuit Court of Appeals, for the Fifth District, which court, on February 28, 1899, affirmed the judgment of the Circuit Court.

The case was then brought to this court on a writ of certiorari to the United States Circuit Court of Appeals for the Fifth Circuit.

*Mr. Victor Leovy* for Leovy. *Mr. Henry J. Leovy* and *Mr. Alexander Porter Morse* were on his brief.

*Mr. George Hines Gorman* for the United States.

MR. JUSTICE SHIRAS, after making the above statement, delivered the opinion of the court.

On March 2, 1849, the Congress of the United States by an act of that date, c. 87, entitled "An act to aid the State of Louisiana in draining the swamp land therein," enacted : "That to aid the State of Louisiana in constructing the necessary levees and drains to reclaim the swamp and overflowed lands therein, the whole of those swamp and overflowed lands, which may be or are found unfit for cultivation, shall be, and the same are hereby, granted to that State." 9 Stat. 352.

Similar grants have been made by Congress to other States within whose boundaries were undrained swamp and overflowed lands belonging to the United States. Act of September 28, 1850, c. 84; 9 Stat. 519. This legislation declares a public policy on the part of the government to aid the States in reclaiming swamp and overflowed lands, unfit for cultivation in their natural state, and is a recognition of the right and duty of the respective States, in consideration of such grants, to make and maintain the necessary improvements.

By the act of September 13, 1890, c. 907, 26 Stat. 436, 454, it is provided :

"That it shall not be lawful to build any wharf, pier, dolphin, boom, dam, weir, breakwater, bulkhead, jetty or structure of any kind outside established harbor lines, or in any navigable waters of the United States where no harbor lines are or may be established, without the permission of the Secretary of War, in any port, roadstead, haven, harbor, navigable river or other waters of the United States, in such manner as shall obstruct or impair navigation, commerce or anchorage of said waters, and it shall not be lawful hereafter to commence the construction of any bridge, bridge draw, bridge piers and abutments, causeway or other works over or in any port, road, roadstead,

haven, harbor, navigable river or navigable waters of the United
States, under any act of the legislative assembly of any State,
until the location and plan of such bridge or other works have
been submitted to and approved by the Secretary of War, or to
excavate or fill, or in any manner to alter or modify the course,
location, condition or capacity of the channel of said navigable
waters of the United States, unless approved and authorized by
the Secretary of War: *Provided*, That this section shall not
apply to any bridge, bridge draw, bridge piers and abutments,
the construction of which has been heretofore duly authorized
by law, or be so construed as to authorize the construction of
any bridge, draw bridge, bridge piers and abutments, or other
works, under an act of the legislature of any State, over or in
any stream, port, roadstead, haven or harbor, or other naviga-
ble water not wholly within the limits of such State."

The tenth section of the same act provided as follows:

"Every person and every corporation which shall be guilty
of creating or continuing any such unlawful obstruction in this
act mentioned, or who shall violate the provisions of the last
four preceding sections of this act, shall be deemed guilty of a
misdemeanor, and on conviction thereof shall be punished by a
fine not exceeding $5000 or by imprisonment (in the case of a
natural person) not exceeding one year, or by both such pun-
ishments, in the discretion of the court. The creating or con-
tinuing of any unlawful obstruction in this act mentioned may
be prevented, and such obstruction may be caused to be re-
moved by the injunction of any Circuit Court exercising juris-
diction in any district in which such obstruction may be threat-
ened or may exist; and proper proceedings in equity to this
end may be instituted under the direction of the Attorney Gen-
eral of the United States."

In the river and harbor act of July 13, 1892, c. 158, 27 Stat.
88, 110, section 7 of the act of 1890 was amended and reënacted
so as to read as follows:

"That it shall not be lawful to build any wharf, pier, dolphin,
boom, dam, weir, breakwater, bulkhead, jetty or structure of
any kind outside established harbor lines, or in any navigable
waters of the United States where no harbor lines are or may

be established, without the permission of the Secretary of War, in any port, roadstead, haven, harbor, navigable river, or other waters of the United States, in such manner as shall obstruct or impair navigation, commerce or anchorage of said waters; and it shall not be lawful hereafter to commence the construction of any bridge, bridge draw, bridge piers and abutments, causeway or other works over or in any port, road, roadstead, haven, harbor, navigable river of navigable waters of the United States under any act of the legislative assembly of any State until the location and plan of such bridge or other works have been submitted to and approved by the Secretary of War, or to excavate òr fill, or in any manner to alter or modify the course, location, condition or capacity of any port, roadstead, haven, harbor, harbor of refuge, or inclosure within the limits of a breakwater, or of the channel of any navigable water of the United States, unless approved and authorized by the Secretary of War. *Provided,* That this section shall not apply to any bridge, bridge draw, bridge piers and abutments the construction of which has been heretofore duly authorized by law, or be so construed as to authorize the construction of any bridge, drawbridge, bridge piers and abutments, or other works, under an act of the legislature of any State, over or in any stream, port, roadstead, haven or harbor, or other navigable water not wholly within the limits of such State."

Subject, then, to the paramount jurisdiction of Congress over the navigable waters of the United States, the State of Louisiana has full power to authorize the construction and maintenance of levees, drains and other structures necessary and suitable to reclaim swamp and overflowed lands within her limits. The pivotal question in the present case is whether Red Pass is a navigable water of the United States in such a sense that a dam erected therein for the purpose, and with the effect, of reclaiming overflowed lands and rendering them fit for cultivation, could be constructed without the previous authorization of the Secretary of War, it being admitted that no such authority was ever applied for òr procured.

Evidence was tendered, on behalf of the defendants, tending to show that the dam in question was built by Robert S. Leovy,

who was the syndic or official of the contiguous ward, in pursuance of a resolution of the police jury of the parish of Plaquemines, dated July 1, 1890, directing such syndic to have Red Pass closed, and also tending to show an approval and ratification of the work by the levee board of the district and by the police jury at a meeting held February 8, 1898, and a direction to the attorney of the board to take such steps as should be necessary to prevent said Red Pass from being reopened. Some of these offers were rejected by the trial court, and exceptions were taken by the defendants. It is evident, however, that the court rejected the offers only because it was the opinion of the court that such evidence was immaterial, inasmuch as if Red Pass was not a navigable water of the United States, within the meaning of the statutes, the defendants would be entitled to a verdict of not guilty, regardless of the action of the police jury and of the levee board; and if Red Pass was such a navigable stream, the action of the state or parish authorities, unauthorized by the Secretary of War, would not avail the defendants. Indeed, the trial judge, in his charge, instructed the jury, as if the evidence had been admitted, in the following terms:

"I charge you that the police jury of the parish had no right to authorize Mr. Robert S. Leovy to dam Red Pass, if Red Pass was a navigable water of the United States. I say that it had no authority, because, in the year 1890, the Congress of the United States passed the law under which this indictment has been brought, forbidding the damming of any navigable stream of the United States without the previous authorization of the Secretary of War. Therefore, as it is not contended, in this case, that there was any authority from the Secretary, but on the contrary there is proof tending to show there was no such authority, then it results that it is no defence for Mr. Robert S. Leovy to show his pretended or alleged authority from the police jury of the parish of Plaquemines. The police jury could not legally have dammed it, and therefore Mr. Leovy could not."

We think, therefore, that we are warranted in regarding the dam in question as constructed under the police power of the State, and within the terms and purpose of the grant by Congress. There was evidence tending to show the character of

the country affected by floods from Red Pass — that it was swamp land and sea marsh from the Mississippi River to the Gulf. The testimony, enclosed in the record, of Shoenberger, president of the police jury and of the levee board; of Lewis, of the state board of engineers; of Wilkinson, ex-president of levee board, and of De Armas, showed that the closing of this pass has resulted in the redemption of large tracts of land, greatly increasing their value; that the property in the fifth ward, before Red Pass and Spanish Pass were closed, was valued at $5000, and at this time it is valued at $100,000; and that if those passes are kept closed for five years more it will be three times as much; and that, if this pass be opened again, by the removal of the dam, the orange property will be ruined.

It is conceded that Red Pass is not a natural stream, but is in the nature of a crevasse, caused by the overflow of water from the Mississippi River. This crevasse seems to have been formed some time before the grant by the United States to Louisiana, and the fact that by this and similar breaks through the banks of the river large tracts of land were rendered worthless, was, it may be assumed, well known to Congress, and was, indeed, the actuating cause of the grant.

As respects navigation through Red Pass, there was some evidence, on the part of the government, that small luggers or yawls, chiefly used by fishermen to carry oysters to and from their beds, sometimes went through this pass; but it was not shown that passengers were ever carried through it, or that freight destined to any other State than Louisiana, or, indeed, destined for any market in Louisiana, was ever, much less habitually, carried through it.

The evidence on the part of the defendants showed that for many years these crevasses or passes have been steadily growing shallower and narrower, and that at the time of closing Red Pass few of the smallest craft attempted to pass through it, and that the so-called mouth, or end of Red Pass next the Gulf, had closed up and become a mere marsh. The trifling use that was made of that pass was restricted to the river end of the crevasse.

We cannot accept the contention of the government's counsel

that, because the jury was left to determine whether the pass was in fact navigable, and found the defendant guilty, the decision of the jury is binding upon the appellate court. We have a right to consider under what instructions and definitions, given by the trial court, the jury found their verdict.

Before we examine the charge of the court, we shall briefly review some of the cases from which may be derived a definition of " navigable waters of the United States," within the meaning of the statutes under which this indictment was brought.

In the case of *Boylan* v. *Shaffer*, 13 La. Ann. 131, it was said by the Supreme Court of the State of Louisiana :

" Were the mere fact that steamboats or flatboats had been a short distance up a stream or bayou in high water a sufficient ground for declaring it a navigable stream, every slight depression on the banks of the Mississippi would then become a navigable stream, and should be opened for the benefit of rafts and boats and the convenience of a few persons, to the total destruction of the planting interests on the banks of the river. It is well known that the State has, for a number of years, been closing the small bayous making out of the principal rivers and bayous, and thus redeeming large and valuable tracts of land."

In the case of *Egan* v. *Hart*, 45 La. Ann. 1358, there was considered the right of the board of state engineers of the State of Louisiana to build a dam across an alleged stream, designated as Bayou Pierre. It was alleged that it was a purely private undertaking which the board of state engineers was not authorized to do at public expense, and that the dam would obstruct the navigation of Bayou Pierre, and would therefore violate the statute of Congress which forbade the construction of any bridge or other works over or in any navigable waters of the United States, unless approved by the Secretary of War. The trial judge, as to the contention that Bayou Pierre was a navigable stream, said :

" From Grande Ecore, where Bayou Pierre enters Red River, to a point some miles below its junction with Torre's Bayou, a stream flowing out of the river, Bayou Pierre has been frequently navigated by steamboats. But from the point of junction to the dam in question it has never been navigated, and is

unnavigable. Between these two points it is nothing but a high-water outlet, going dry every summer at many places, choked with rafts and filled with sand, reefs, etc. It has no channel; in various localities it spreads out into shallow lakes and over a wide expanse of country, and is susceptible of being made navigable just as a ditch would be if it were dug deep and wide enough and kept supplied with a sufficiency of water."

And accordingly it was found by the trial court that Bayou Pierre was not a navigable water of the United States. Its judgment was affirmed by the Supreme Court of Louisiana, and the case was brought to this court and the judgment of the court below affirmed. *Egan* v. *Hart,* 165 U. S. 188.

In *Lake Shore & Michigan Southern Railway* v. *Ohio,* 165 U. S. 365, a judgment of the Supreme Court of Ohio, affirming a judgment of a trial court, whereby the defendant, an Ohio corporation, was directed to absolutely remove a bridge or modify its structure over the Ashtabula River, a stream wholly within the State of Ohio, was brought to and affirmed by this court. The case was thus stated in the opinion delivered by Mr. Justice White:

" Both the pleadings and the errors here assigned deny the jurisdiction of the State of Ohio or of its courts to control the subject-matter of the controversy, on the theory that the determination of whether the defendant possessed the right to erect the bridge and to continue it, although constructed without authority, is a Federal and not a state question. This contention is predicated on the act of Congress of September 19, 1890, (26 Stat. 423).

" The contention is that the statute in question manifests the purpose of Congress to deprive the several States of all authority to control and regulate any and every structure over all navigable streams, although they be situated wholly within their territory. That full power resides in the States as to the erection of bridges and other works in navigable streams wholly within their jurisdiction, in the absence of the exercise by Congress of authority to the contrary, is conclusively determined." *Wilson* v. *Blackbird Creek,* 2 Pet. 245; *Withers* v. *Buckly,* 20 How. 84; *Cardwell* v. *American Bridge Co.,* 113 U. S. 205;

*Willamette Bridge Co.* v. *Hatch,* 125 U. S. 1; *Shively* v. *Bowlby,* 152 U. S. 33, and cases there cited.

"Indeed the argument at bar does not assail the rule settled in the foregoing cases, but asserts that as the power which it recognizes as existing in the States is predicated solely upon the failure of Congress to assert its paramount authority, therefore the rule no longer obtains, since the act of 1890, relied on, substantially amounts to an express assumption by Congress of entire control over all and every navigable stream, whether or not situated wholly within a State."

After quoting the language of the statute, the opinion proceeded:

"On the face of this statute, it is obvious that it does not support the claim based upon it. Conceding, without deciding, that the words 'water-ways of the United States,' therein used, apply to all navigable waters, even though they be wholly situated within a State, and passing, also without deciding, the contention that Congress can lawfully delegate to the Secretary of War all its power to authorize structures of any kind over navigable waters, nothing in the statute gives rise even to the implication that it was intended to confer such power on the Secretary of War. . . . It follows, therefore, that even conceding, *arguendo*, that the words 'navigable waters,' as used in the act, were intended to apply to streams wholly within a State, its obvious purpose was not to deprive the States of authority to grant power to bridge such streams, or to render lawful all bridges previously built without authority, but simply to create an additional and cumulative remedy to prevent such structures, although lawfully authorized, from interfering with commerce."

In the case of *The Daniel Ball,* 10 Wall. 557, the following definition of the term "navigable waters" was expressed:

"Some of our rivers are as navigable for many hundreds of miles above as they are below the limits of tidewater, and some of them are navigable for great distances by large vessels which are not even affected by the tide at any point during their entire length. A different test must, therefore, be applied to determine the navigability of our rivers, and that is found in their

navigable capacity. Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water."

In the case of *The Montello*, 20 Wall. 430, 441, the following language was used:

"The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river rather than the extent and manner of that use. If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or highway. Vessels of any kind that can float upon the water, whether propelled by animal power, by the wind, or by the agency of steam, are, or may become, the mode by which a vast commerce can be conducted, and it would be a mischievous rule that would exclude either in determining the navigability of a river."

In *Withers* v. *Buckley*, 20 How. 84, this court said:

"The act of Congress of March 1, 1817, in prescribing the free navigation of the Mississippi and the navigable waters flowing into this river, could not have been designed to inhibit the power inseparable from every sovereign or efficient government, to devise and to execute measures for the improvement of the State, although such measures might induce or render necessary changes in the channels or courses of rivers within the interior of the State, or might be productive of a change in the value of private property."

"Neither the Fourteenth Amendment, broad and comprehensive as it is, nor any other amendment, was designed to interfere with the power of the State, sometimes termed its 'police power,' to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity. From the very necessities of society, legislation of a special character, having those objects in view, must often be had in certain districts, such as for draining marshes and irrigating arid plains." *Barbier* v. *Connolly*, 113 U. S. 27.

It is a safe inference from these and other cases to the same effect which might be cited, that the term, "Navigable waters of the United States," has reference to commerce of a substantial and permanent character to be conducted thereon. The power of Congress to regulate such waters is not expressly granted in the Constitution, but is a power incidental to the express "power to regulate commerce with foreign nations, and among the several States and with the Indian tribes;" and with reference to which the observation was made by Chief Justice Marshall, that "it is not intended to say that these words comprehend that commerce which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States." *Gibbons* v. *Ogden,* 9 Wheat. 1, 194.

While, therefore, it may not be easy for a court to define the size and character of a stream which would place it within the category of "navigable waters of the United States," or to define what traffic shall constitute "commerce among the States," so as to make such questions sheer matters of law, yet, in construing the legislation involved in the case before us, we may be permitted to see that it was not the intention of Congress to interfere with or prevent the exercise by the State of Louisiana of its power to reclaim swamp and overflowed lands by regulating and controlling the current of small streams not used habitually as arteries of interstate commerce.

The trial judge instructed the jury as follows:

"What is a navigable water of the United States? It is a navigable water which, either of itself, or in connection with other water, permits a continuous journey to another State. If a stream is navigable, and from that stream you can make a journey by water, by boat, by one of the principal methods used in ordinary commerce, to another State from the State in which you start on your journey, that is a navigable water of the United States. It is so called in contradistinction to waters which arise and come to an end within the boundaries of the State. . . . But, if from the water in one State you can travel by water continuously to another State, and the water is a navigable water, then it is a navigable stream of the United

States. . . . If it was navigable, and connected with waters that permitted a journey to another State, then it is a navigable water of the United States." And again: "But the fact I wish to impress upon you is this, that it is not absolutely necessary that you should find that there was navigability all the way from the Jump out to the Gulf, because if, from some point beyond the place where Mr. Robert S. Leovy built this dam, towards the Mississippi River, the stream was navigable, then it would be a navigable stream of the United States, because it would connect with the Mississippi River."

If these instructions were correct, then there is scarcely a creek or stream in the entire country which is not a navigable water of the United States. Nearly all the streams on which a skiff or small lugger can float discharge themselves into other streams or waters flowing into a river which traverses more than one State, and the mere capacity to pass in a boat of any size, however small, from one stream or rivulet to another, the jury is informed, is sufficient to constitute a navigable water of the United States.

Such a view would extend the paramount jurisdiction of the United States over all the flowing waters in the States, and would subject the officers and agents of a State, engaged in constructing levees, to restrain overflowing rivers within their banks, or in regulating the channels of small streams for the purposes of internal commerce, to fine and imprisonment, unless permission be first obtained from the Secretary of War. If such were the necessary construction of the statutes here involved, their validity might well be questioned. But we do not so understand the legislation of Congress. When it is remembered that the source of the power of the general government to act at all in this matter arises out of its power to regulate commerce with foreign countries and among the States, it is obvious that what the Constitution and the acts of Congress have in view is the promotion and protection of commerce in its international and interstate aspect, and a practical construction must be put on these enactments as intended for such large and important purposes.

We also think that these instructions are open to the further

criticism that they contain no reference to the nature or extent of the traffic or trade carried on in Red Pass before the erection of the dam. Indeed, the charge necessarily implies that the defendant was guilty if there was merely a capacity for passing from Red Pass into the Mississippi River on any sort of a boat. Very different was the view expressed by Chief Justice Shaw when he said it is not "every small creek in which a fishing skiff or gunning canoe can be made to float at high water, which is deemed navigable, but in order to give it the character of a navigable stream it must be generally and commonly useful to some purpose of trade or agriculture." 21 Pick. 344.

We have read the testimony offered on behalf of the United States to show the kind and extent of the navigation of the Red Pass, and there is no view we can take of it that warranted the jury in finding that interstate commerce was ever transacted thereon. A few fishermen testified that they occasionally went through this pass with small vessels, carrying oysters for planting, and one or two cargoes of willows and timber were spoken of. None of these witnesses pretended to have carried produce or oysters out of the State. Nor can it be contended that the Red Pass, at the time the dam was built, was open to the Gulf. It was shown that the Gulf end of the pass had closed up, so that to get to the sea it was necessary to go out of Red Pass into Tiger Pass, Tontine Pass, and Grand Pass, which are open to the Gulf. And, accordingly, the trial judge instructed the jury that it was not necessary, in order to find Red Pass to be a navigable water of the United States, that they should find that it was navigable out to the Gulf; that it was sufficient if boats could reach the Mississippi River.

We think the defendant was entitled to the instruction asked for, but refused, that the jury should be satisfied from the evidence that Red Pass was at the time it was closed, as alleged in the indictment, substantially useful to some purpose of interstate commerce. The instruction actually given was as follows:

"If Tontine Pass and Red Pass are available for commerce and navigation by means of luggers and oyster boats for the purpose of useful commerce, it would be a navigable stream; and if you find that it connected with other waters over which

a continuous journey could be made to other States, then it would be a navigable water of the United States.

"I repeat to you that, under my view of the case, all you have to decide is whether Red Pass was a navigable water of the United States, and as you decide that the case will go, because it is conceded that Mr. Leovy dammed it."

. It is plain, therefore, that the attention of the jury was not directed at all to the question of any existing interstate commerce, and that the learned judge was of opinion, and so ruled, that the physical possibility of passing by a boat out of Red Pass into the Mississippi River constituted the pass a navigable water of the United States.

The court refused to give the following instruction:

"If the jury shall find that Red Pass was a crevasse, or outbreak, of the Mississippi River from its natural channel, the result of which was to overflow a large portion of Plaquemines Parish, to the detriment of the inhabitants thereof, by the destruction of their property, and prejudicial to their health, the State, in the exercise of its police power, delegated to the police jury of the parish of Plaquemines, had a right to close it."

Perhaps this instruction ought to have been qualified or accompanied by a prayer that the acts of Congress, relied on by the government, were not applicable to the case suggested in the instruction asked for. But we think, in the circumstances disclosed by the evidence, the instruction should have been given, at least as so qualified.

The Circuit Court of Appeals, in dealing with the error assigned for the refusal of the trial judge to so charge, said:

"There is no legitimate evidence in the record tending to show that the police jury of the parish of Plaquemines ordered Red Pass closed for the purpose of ‘affecting or promoting the peace, morals, education, health or good order of the people;’ but the case does show that the pass was ordered closed, and was closed, for the sole purpose of reclaiming swamp lands. Under the power to regulate commerce, Congress having forbidden the closing of any navigable river without the consent of the United States, it is very doubtful whether any navigable water of the United States, although wholly within the limits

of the State, can be closed under the exercise of the police power of the State for any purpose whatever, but where the purpose is only the reclamation of swamp lands, there is no doubt the police power of the State must give way to the authority of Congress."

We think that the trial court might well take judicial notice that the public health is deeply concerned in the reclamation of swamp and overflowed lands. If there is any fact which may be supposed to be known by everybody, and, therefore, by courts, it is that swamps and stagnant waters are the cause of malarial and malignant fevers, and that the police power is never more legitimately exercised than in removing such nuisances. The defendant was not deprived of the defence that the act which he was charged with was performed in order to promote the health of the community, by the fact, if fact it was, that the order under which he acted did not say anything about the subject of health, but simply authorized the erection of the dam, so as to exclude the overflow from the river.

Nor are we disposed to concur in the doubt expressed whether any navigable water wholly within the limits of a State can be closed under the exercise of the police power for any purpose whatever. Such a doubt might be justified if there was express legislation of the United States forbidding the act proposed. But, as we have seen, in the present case the reclamation of swamp and overflowed lands was not only not forbidden, but was recognized as the duty of the State, in consideration of the grant of the public lands. And, for the reasons already given, we do not construe the acts of Congress under which this indictment was brought as intended to apply to the case of a stream of the history and character disclosed in this record. Hence, the state authorities were left free to act in such a manner as they thought fit to promote the health and prosperity of the people concerned.

It can scarcely be contended that if, by a sudden breach of the banks of the Mississippi River in the lowlands of Louisiana, a stream of water across agricultural lands was created, endangering the health and welfare of the inhabitants, the case

would be within the meaning and operation of the acts of Congress relied on in this case. It may be that in such a case, if the State declines to act or, rather, permits such a stream to become a highway of commerce among the States, the Federal control over it might attach. Thus Grand Pass, of which Red Pass is a branch, might, in view of the volume of its water and of the nature and amount of the commerce carried on it, be held to be a navigable water of the United States. However that may be, our conclusion, upon the record now before us, is that Red Pass, in the condition it was at the time when this dam was built, was not shown by adequate evidence to have been a navigable water of the United States, actually used in interstate commerce, and that the court should have charged the jury, as requested, that, upon the whole evidence adduced, the defendants were entitled to a verdict of acquittal.

It is claimed by the counsel for the plaintiff in error that the act of July 13, 1892, so far amended and repealed the act of September 19, 1890, that the penal section of the latter was repealed, and that hence, as no penalty is provided in the act of 1892, the indictment and conviction of the plaintiff in error was without authority of law. It is also contended that the policy of Congress, in respect to the authority of the Secretary of War in the matter of obstruction to navigation, has been greatly changed and modified by the act of March 3, 1899. Fifty-fifth Cong. Session 3, Ch. 425, sec. 9, p. 1151.

It is also suggested that whatever may be the powers of Congress, over streams wholly within the State, they cannot be legitimately enforced by criminal prosecution of officers and agents of the State for acts done under state authority, but that, in such cases, the proper remedy would be found in bills in equity.

But in the view we take of the case in hand, we are not called upon to express any opinion on such questions.

*The judgment of the Circuit Court of Appeals is reversed; the judgment of the Circuit Court is likewise reversed, and the cause is remanded to that court, with directions to award a new trial.*