## CENTRAL CLAY DRAINAGE DISTRICT *v.* BOOSER.

## Opinion delivered March 15, 1920.

1. CONSTITUTIONAL LAW—POLICE POWER OF STATES.—The States, under the police power, have full power to regulate within their limits all matters which tend to promote the peace, health, convenience and prosperity of their people.
2. NAVIGABLE WATERS — POWER OF STATE TO CLOSE NAVIGATION.— Where Congress, by act of July 27, 1916, declared Cache River to be navigable, and the State, by Acts 1917, page 1884, accepted such declaration, it was within the powers of the Legislature to close the river to navigation entirely.

Appeal from Clay Chancery Court, Eastern District; *Archer Wheatley,* Chancellor; reversed.

#### STATEMENT OF FACTS.

Appellant is a drainage district duly organized under the laws of the State of Arkansas for the purpose of reclaiming lands for agricultural purposes by drainage. Cache River runs through Clay County, Arkansas, and its course was straightened by the drainage commissioners and as straightened it was used as the main drainage ditch.

Appellees claim that Cache River is navigable, and as such is one of the public highways of the State on which they have a right to float logs and to erect booms to be utilized in floating logs.

The General Assembly passed an act closing Cache River to navigation in Clay County, Arkansas. Appellant brought this suit against appellees to restrain them from erecting booms in Cache River or floating logs in it, or in the subsidiary drainage ditches in Clay County, Arkansas.

According to the testimony of the civil engineer of the Central Clay Drainage District, it was formed under the general laws of the State of Arkansas, and Cache River runs through the central portion of Clay County. In the central portion of the county Cache River flows into a large area of sunk lands and is called Cache Lake. The main drainage ditch has been dug through Cache Lake and on down into Greene County where it again connects with Cache River. The waters of Cache River have been diverted into this main drainage ditch so that Cache River, as straightened by the drainage ditch, drains and reclaims large areas of agricultural land which before the drainage ditch was constructed were not susceptible of cultivation. There is one main ditch and twenty-six subsidiary ditches. Ninety thousand acres of land are drained by the ditches. Appellees have erected booms in one of the subsidiary ditches and are engaged in floating logs down the subsidiary ditch as well as the main drainage ditch. The booms obstruct the flow of the water in the drainage ditches, and the banks of the ditches are injured by rolling logs down them into the ditches. The main injury to the ditches is done by obstructing the flow of the water and thereby causing them to fill up, and thus defeat the object for which the drainage district was formed.

According to the testimony of appellees, Cache River is a navigable stream in Clay County, although its principal navigable use of late years has been to float logs. About thirty-five years ago a small steamboat ten or

twelve feet wide and twenty-five feet long plied its waters in Clay County. It was principally used in towing logs. After its use was discontinued, float roads have been cut through Cache Lake into the main channel of Cache River and logs have been floated down it every year. Cache River can be used for floating logs about six months in the year, and it will take appellees about eight years to finish cutting and floating their logs. They state that their use of the river in floating logs does not in any manner impair its use as a drainage ditch.

The chancellor found the issues in favor of the appellees and dismissed the complaint of appellant for want of equity upon condition, however, that appellees execute a bond that they will repair all damages to the ditches or banks thereof and remove any logs that sink and tend to obstruct the channel during the period of time they are engaged in floating logs. The case is here on appeal.

*L. Hunter,* for appellant.

The findings and decree of the chancellor are not sustained by the facts shown by the evidence and the law governing the case. While a lake or stream may, from its very nature, be navigable for the purpose of commerce without any legislative action declaring it to be such, but when both Congress and the State Legislature declare by public act that a stream is not a navigable stream, it must be accepted as a fact, and no court has the legal power to adjudge or decree otherwise. Appellees were trespassers and had no rights to be interfered with. If any artificial means are necessary to condition a stream or body of water for floating purposes or for navigation, then it can not be navigable or floatable as defined by law. 39 Ark. 403; 119 *Id.* 377-381; 166 Ill. 249; 1 Farnham on Waters, etc., 103; *Ib.* 124, and cases cited. Cache River and lake were never navigable or to be regarded as a navigable stream under the best authorities, and Congress and our Legislature have declared it a non-navigable stream. Act 406, Acts 1917, p. 1884. The finding of

the chancellor that Cache Lake or Sunk Lands was a navible stream is not supported by the evidence nor the law. *Supra.* As these parties, the appellees, were trespassers they can not complain and the injunction ought to have been sustained, as there was no other remedy.

*Lamb & Frierson,* for appellees.

1. The evidence establishes that, regardless of the right or lack of right to use the ditches for floating, absolutely no substantial injury has been done or will be done by the floating shown in this case. It is not shown that the banks are injured by having logs piled on them or otherwise. On the facts the decree should be reversed.

2. Cache River and Cache Lake are navigable or floatable streams and highways of commerce. 17 R. C. L. 1120-1125; 42 L. R. A. 305 and note; 5 *Id.* 392 and note; 9 L. R. A. (N. S.) 392; 9 *Id.* 894; 27 *Id.* 670; 41 L. R. A. 371 and note; 38 L. R. A. (N. S.) 114. A navigable stream is a public highway. 94 Ark. 370. A stream is navigable legally when it is navigable *in fact* for rafts, boats or barges. 39 Ark. 403. See also 9 L. R. A. (N. S.) 894; 89 S. W. 351; 96 Pac. 845.

3. The fact that obstructions must be removed in order to float logs does not prove Cache river and lake non-navigable. 38 L. R. A. (N. S.) 113. In 1811 Congress declared all navigable streams in the Louisiana Territory "public highways." U. S. Comp. Stat. 1916, § 9846, p. 12145. See also 50 Am. Dec. 641.

4. Since the river and lake were navigable highways by prescriptive use, the artificial channel or ditch is also to be treated as a navigable stream and the ditches are navigable. 22 Wis. 546; 4 L. R. A. 323, note; 51 L. R. A. (N. S.), 236; 25 Ann. Cas. 1912 D, 1029; 58 U. S. (L. Ed.), 671; 29 Cyc. 305. A strong case of artificial waterway as a navigable water is 17 Am. Cas. 343, 22 L. R. A. (N. S.), 435, and note. See also 14 Ann. Cas. 907; 97 N. W. 192; 7 *Id.* 904; 12 *Id.* 215; 48 U. S. (L. Ed.), 73; 46 N. E. 203; 135 Ark. 407; 29 Cyc. 356.

5.  The equities are with the appellees, and the decree which protected the ditches and gave appellees a modified right to save their investment from destruction was just and equitable and should be affirmed.

HART, J. (after stating the facts).  According to the record the main drainage ditch consists of Cache River, as straightened by the ditch which was dug through Cache Lake, and extended southward into Greene County where it again joins Cache River.  This artificial channel is about 100 feet wide and 10 or 12 feet deep.

Counsel for appellees contend that where an artificial channel is cut for the purpose of straightening a navigable stream and the stream as straightened is navigable, in fact, the public have the same rights to navigate it as they did before the artificial channel was cut. Hence they claim that, Cache River being a navigable stream before the artificial channel was cut, the main ditch became a part of the channel of Cache River, and that they have a right to navigate it just as they did before the drainage ditch was created.

In making this contention they have not given full effect to an act of the Legislature passed in 1917, which accepts the declaration of Congress that Cache River is not navigable.  Acts of Arkansas, 1917, volume 2, p. 1884.

This act recites that the Congress of the United States in 1916 passed an act that Cache River in the State of Arkansas be declared a non-navigable stream within the meaning of the Constitution and laws of the United States, and that this provision shall become void after one year, unless within that time the Legislature of Arkansas shall pass an act expressly approving the declaration.

The Arkansas act further recites that Cache River is not in point of fact navigable and that the necessity of making bridges over it draw bridges would greatly restrict the development of the adjacent country.

Section 1 of the act provides that the General Assembly of the State of Arkansas doth approve the declaration of the Congress of the United States in declaring Cache River to be non-navigable.

It is contended by counsel for appellees that the main purpose of this act is to provide for bridges over Cache River without draws, and that the act has no relation to navigating the river by floating rafts and logs on it. The act must be construed according to the language used. The act of Congress plainly declares that Cache River in the State of Arkansas is declared to be a non-navigable stream within the meaning of the Constitution and laws of the United States. The Constitution of the United States gives Congress the power to regulate interstate commerce, and under it Congress has the power to pass laws regulating the navigation of public rivers and to prevent obstructions to the navigation thereof. The evident purpose of the act of Congress was to withdraw any power Congress might have over the navigation of Cache River, so that it should pass wholly under the control of the State. This is made manifest by the language of the act which declares Cache River to be non-navigable provided within a year thereafter the Legislature of Arkansas shall pass an act approving the declaration. It is true the act of the General Assembly, after reciting this fact, also recites that the necessity of making the bridges over Cache River with draws greatly restricts the development of the adjacent country. This, however, was only one of the reasons for legislative action. The main fact is, that the Legislature declared the stream to be a non-navigable one. This brings us to a consideration of the question of whether or not it had the power to do so. Numerous cases might be cited which recognize the right of States to partially obstruct navigation in case like this by the erection of permanent bridges without draws across the rivers and by allowing booms to be erected in the rivers for the purpose of facilitating the floating of logs; but we do not deem it necessary to do so and go straight to the discussion of the broader power of

whether the State may entirely close a navigable river when the power exercised does not conflict with the jurisdiction of Congress over it.

It is well settled that the States, under the police power, have full power to regulate within their limits all matters which tend to promote the peace, health, convenience and prosperity of their people. In regard to streams which are navigable for only a part of the year and for only limited purposes the question of the right to close the stream to navigation as a measure of public benefit is of great public importance and has been the subject of much consideration. While there is some diversity of opinion, the question depends upon the importance of the navigation as compared with the interests which would be promoted by sacrificing it.

In *Wilson* v. *Black Bird Creek Marsh Co.*, 2 Pet. U. S. 245, the Supreme Court of the United States recognized the right of the State to close Black Bird Creek against navigation. There the plaintiffs were authorized to construct a dam across the stream which passed through a deep level marsh. The court said: ''The value of the property on its banks must be enhanced by excluding the water from the marsh, and the health of the inhabitants probably improved. Measures calculated to produce these objects, provided they do not come into collision with the powers of the general government, are undoubtedly within those which are reserved to the States.''

Again the doctrine was recognized in *Gilman* v. *Philadelphia*, 3 Wall. U. S. 713, where a bridge was constructed across the Schuylkill River which had the effect to obstruct the navigation of that river. In discussing the question the court said:

''It must not be forgotten that bridges, which are connecting parts of turnpikes, streets, and railroads, are means of commercial transportation, as well as navigable waters, and that the commerce which passes over a bridge may be much greater than would ever be transported on the water it obstructs.

"It is for the municipal power to weigh the considerations which belong to the subject, and to decide which shall be preferred, and how far either shall be made subservient to the other. The States have always exercised this power, and from the nature and objects of the two systems of government they must always continue to exercise it, subject, however, in all cases, to the paramount authority of Congress, whenever the power of the States shall be exerted within the sphere of the commercial power which belongs to the nation."

In *Leovy* v. *United States,* 177 U. S. 621, Red Pass, a navigable stream, was closed to navigation by a dam across it for the purpose of constructing a drainage district organized under the laws of the State of Louisiana and it was held that, under the police power, the State had the power to construct the dam across Red Pass. In discussing the question the court said:

"Nor are we disposed to concur in the doubt expressed whether any navigable water wholly within the limits of a State can be closed under the exercise of the police power for any purpose whatever. Such a doubt might be justified if there was express legislation of the United States forbidding the act proposed. But, as we have seen, in the present case the reclamation of swamp and overflowed lands was not only not forbidden, but was recognized as the duty of the State, in consideration of the grant of the public lands. And, for the reasons already given, we do not construe the acts of Congress under which this indictment was brought as intended to apply to the case of a stream of the history and character disclosed in this record. Hence the State authorities were left free to act in such manner as they thought fit to promote the health and prosperity of the people concerned."

The question came up for discussion by the Supreme Court of Delaware in the case of *Bailey* v. *P. W. & B. R. R. Co.,* 44 Am. Dec. 593, and the court said:

"It is true that, in relation to great rivers which afford essential means of commerce with other States and the world, certain restrictions are imposed on the States

themselves by the Constitution of the United States; but of such a river as this it may be assumed, at least since the case of *Wilson* v. *The Black Bird Creek Marsh Company*, 2 Pet. 251, that the State has the unrestricted right of a proprietor over its waters; and may obstruct or close the same, if the public interest or convenience requires it to do so. As a public highway, it is free to all citizens for navigation or fishery; but when the Legislature deems it more beneficial to the public to close this highway, by a permanent bridge, or to exclude the fish from its waters by a dam, it is a question only of public expediency, and furnishes no just ground of complaint from individuals who have heretofore enjoyed benefits and advantages which may be abridged, or cut off, by the improvement."

In *Selman* v. *Wolfe*, 27 Tex. 68, the court said that the Legislature, if in its judgment the public interest will be promoted by so doing, may undoubtedly either partially or wholly obstruct navigable streams exclusively within the State. To the same effect see *Depew* v. *Wabash and Erie Canal*, 5 Ind. 8; *Ingraham, Kennedy & Day* v. *Chicago, D. & M. R. R. Co.*, 34 Iowa 249, and *Commonwealth* v. *John Breed*, 4 Pick. (Mass.) 460.

In the case at bar it appears from the record that a vast area of rich agricultural lands will be reclaimed by the construction of the proposed improvement, and undoubtedly the health of the community will be greatly benefited. It does not appear that the stream has been used for the purpose of navigation for many years except for the purpose of floating logs on it. It is true appellees say that this will be the only way of getting out their logs and that it will take them eight years to finish cutting and floating out their logs. This was a matter that addressed itself to the Legislature. It was the proper judge of what was expedient in this behalf. In all cases of this sort the Legislature has the power to inquire when the public health, convenience and necessity demands whether a stream, like the one in question, shall be partly or wholly closed to navigation when such act

of the Legislature is not opposed to any action of Congress on the subject.

It follows that the court erred in dismissing the complaint for want of equity, and for that error the decree will be reversed and the cause remanded with directions to the chancery court to grant the relief prayed for.