IxKNOLL, Justice,
dissenting.
For the following reasons, Í respectfully dissent from the majority’s determination that there was no State action on the part of the Baton Rouge Port Commission and, even if there was, that it acted as a market participant, not a market regulator.
The majority ignores that Louisiana’s history and economy are closely tied to the Mississippi River, and because of that relationship, the state “jealously guards against impediments to the river’s commerce.” Wood Marine Service, Inc. v. City of Harahan, 858 F.2d 1061, 1064 (5th Cir.1988). It is likewise evident that the United States national government recognized the significance of the Mississippi River, as seen when Louisiana was admitted to the Union, Act of Feb. 20, 1811, codified 33 U.S.C. § 10, it conditioned statehood on the proviso that “[a]ll the navigable rivers and waters in the Territory of Orleans and Louisiana shall be and forever remain public highways.” Cor-relatively, it is well recognized that the power of the United States over its waters which are capable of use as interstate highways flow from the Commerce Clause of the Constitution. United States v. Appalachian Elec. Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940). Thus, it was held early in our country’s history that the power to regulate commerce necessarily includes the power over |2navigation. Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 189, 6 L.Ed. 23 (1824); Leovy v. United States, 177 U.S. 621, 20 S.Ct. 797, 44 L.Ed. 914 (1900).
I recall this history, since I find that the case before us essentially involves the navigation of vessels on the public highway of the Mississippi River. Bisso’s tugs meet ships at *635 mid-stream and propel them across the water so that they can dock at the Burnside terminal. Likewise, when ships have completed the delivery/loading of their cargo dockside, Bisso’s tugs propel them from the Burnside terminal back to mid-stream so that they can again enter the stream of commerce. It is this activity, all of which occurs in the free-flow of the Mississippi River, that Ormet’s mandatory tug arrangement affects.
It is conceded that the Burnside terminal processes cargo that is in interstate and foreign commerce. The discrimination that Crescent, ENB, and RivCo identify is that the Ormet-Bisso contract causes the cost to rise for ships from out-of-state to use the terminal and deprives other tug companies from servicing the Burnside terminal. Although I find it unnecessary to enter the fray as to whether costs are indeed higher, since I find that such inquiry distracts from the real discrimination at hand, I choose to focus on the monopolistic control of tug services at a publicly owned facility. With this as my focal point, I find that the Ormet-Bisso contract has upended the way that business has been traditionally conducted and, in the process, has removed competition from the process of fixing rates that ship owners pay for tug services at this public terminal.[1] The outcome of this contract has deprived everyone but Bisso from serving ships who call on this publicly funded terminal. Furthermore, | .-¡ships calling on this public terminal have been denied the opportunity to negotiate tug fees and to receive the economic benefits from discounts that they heretofore garnered.
As evidence of my concern, I reference the trial court’s poignant commentary on the monopolistic practice Ormet and Bisso entered with the quiet blessing of the Port Commission. Addressing Ormet’s anti-competitive contract with Bisso, the trial court recognized that this business arrangement may not be in the best interest of the Port of Baton Rouge. In particularizing this concern, the trial court, paraphrasing Channing Hayden, the president of the New Orleans Steamship Association, said, “[I]f this arrangement is allowed, it very likely might spread, it could have a deleterious effect.”
Against this backdrop, I disagree with the majority’s determination that the Commission’s actions as lessor or its acquiescence in Ormet’s private contract do not constitute state regulation that violates the Commerce Clause scrutiny.
It is well recognized that the Commerce Clause grants to Congress and correspondingly withholds from the various states the power to regulate commerce among the several states. U.S. Const. Art. I, § 8. Because the authority which the Constitution confers is the power to regulate, the dictates of the dormant Commerce Clause are not activated unless state action may be characterized as a regulation. SSC Corp. v. Town of Smithtown, 66 F.3d 502 (2nd Cir.1995), cert. denied, 517 U.S. 1150, 116 S.Ct. 1453, 134 L.Ed.2d 571 (1996).
I agree with Crescent, ENB, and RivCo that the public ownership of the land and terminal and Ormet’s obligations under its lease with the Port Commission constitute the grounds for finding tangential state action which would invoke the dormant Commerce Clause. Pursuant to La.R.S. 34:1223(C), “[t]he [port] | commission shall regulate the commerce and traffic within such port area in such a manner as may, in its judgment, be for the best interest of the state.” In furtherance of this statutory obligation, Ormet agreed in its lease with the Port Commission to make the Burnside terminal available to the public “without undue discrimination.” From this it can be readily seen that there exists a symbiotic relationship between the Port Commission and Or-met. Thus, I find that Ormet’s use of the Burnside terminal is intertwined with public use.
In Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), the United States Supreme Court held that a municipal landlord cannot permit *636 its private tenants to discriminate in violation of the constitution. There the Wilmington Parking Authority, a state agency, leased space in a publicly owned parking facility to a restauranteur. When the, restaurant refused to serve Burton solely because of his race, the patron, naming both the parking authority and the private lessee, sought declaratory and injunctive relief to end the discrimination. Addressing the question of whether this private discrimination constituted state action, the Burton Court held that “no State may effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be.” Id., 365 U.S. at 725, 81 S.Ct. at 861. Moreover, the Court held that “[b]y its inaction, the Authority, and through it the State, has not only made itself a party to the refusal of service, but has elected to place its power, property and prestige behind the admitted discrimination.” Id., 365 U.S. at 725, 81 S.Ct. at 862.
Although Burton was decided under the Fourteenth Amendment, I find its analysis applicable to the facts herein. Ormet agreed in its lease of this public facility not to unduly discriminate. Accordingly, I find that Ormet may not take solace in its characterization as a private corporation, reap the benefits of its leasehold of a Rpublicly funded terminal, and yet attempt to insulate itself from the implications of the Commerce Clause. In like manner, the Port Commission is duty-bound to operate the Burnside terminal with the ' State’s best interest in mind. Accordingly, I find that the Port Commission may not shirk its statutory duties by using Ormet as a shield.[2] Therefore, I find that Ormet and the Port Commission have acted to regulate interstate commerce under the dormant Commerce Clause.
I further disagree with the majority’s determination that the Port Commission is immune from scrutiny under the Commerce Clause because the Port Commission as a landlord is acting as a market participant, not a market regulator.
At the threshold of its Commerce Clause analysis, the Supreme Court has drawn an important distinction between “regulation” of, and “participation” in, a market. When a state engages in market “participation” — that is, when it enters the open market as a buyer or seller on the same footing as private parties — there is less danger that the state’s activity will interfere with Congress’s plenary power to regulate the market. As the Court has explained, the Commerce Clause “restricts ‘state taxes and regulatory measures impeding free private trade in the national marketplace,’ but ‘[there] is not indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market.’ ”
SSC, 66 F.3d at 510, citing Wisconsin Dep’t of Indus., Labor & Human Relations v. Gould, Inc., 475 U.S. 282, 289, 106 S.Ct. 1057, 1062, 89 L.Ed.2d 223 (1986)(quoting Reeves Inc. v. Stake, 447 U.S. 429, 437, 100 S.Ct. 2271, 2277, 65 L.Ed.2d 244 (1980)). (Emphasis added).
In the present case, it is evident that the Port Commission is not just a landlord, seeking to earn rental revenues from the wise investment of its property. Unlike private landlords, the Port Commission is constrained to operate the Burnside terminal with the State’s best interest in mind, La. R.S. 34:1223(0, and is prohibited [6from granting an exclusive franchise to any carrier, La.R.S. 34:1223(E). Thus, I find, unlike the majority, that the Port Commission is a “market regulator.”
I further note that although the Port Commission was authorized to enter into a lease agreement with Ormet for the Burnside terminal, nowhere in the lease was Ormet granted authority beyond the public facility. Specifically, I point out that the Port Commission leased to Ormet particularly described immovable property in Ascension Parish, together with a ship and barge dock and all improvements located thereon. By seeking to control tugboat and steamship *637 operations on the Mississippi River, it is evident to me that Ormet has attempted to extend the tentacles of the lease into a realm over which it has no authority. Thus, I find that Ormet has exceeded the authority granted it under the lease agreement and has impermissibly regulated navigation on the Mississippi River thereby burdening the free flow of interstate commerce.
Moreover, it is clear to me that this exclusive arrangement profoundly impacts interstate commerce by regulating the market between the tugboat and steamship industry in this aspect of navigation and is thereby directly burdened. Simply stated, the exclusive contract between Ormet and Bisso discriminates against the stream of interstate commerce because it mandates that only the favored operator, Bisso, may provide tug service to vessels in interstate commerce who utilize a public owned facility. In this regard, I find that the Commerce Clause protects the interstate market, i.e. the unfettered use of the public terminal by interstate shippers on the Mississippi River, not just the tug companies who compete to serve the interstate carriers. Compare Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 98 S.Ct. 172207, 57 L.Ed.2d 91 (1978).[3]
Lastly, I find that it is significant that Ormet retains $350 from the amount charged shipowners for the use of each Bisso tug assisting in docking and undocking at the Burnside terminal and that Bisso is paid only $1,100 for the tug services it provides ships utilizing this public facility. As admitted in Ormet’s brief, “[tjerminal management sought to improve the terminal’s efficiency and safety and to make a profit on the services as well” In C & A Carbone, the Supreme Court stated that “[djiserimination against interstate commerce in favor of local business or investment is per se invalid,.... ” C & A Carbone, 511 U.S. at 392, 114 S.Ct. at 1683. Applying this proposition to the present case, I further find that the imposition of this fee benefits a local actor, Ormet, to the detriment of interstate commerce. Thus, I find that it has been demonstrated that Or-met’s exclusive contract with Bisso both discriminates against and burdens interstate commerce.

. Although, as adroitly pointed out by Ormet and the Port Commission, no ship owners or their agents are parties to this litigation, the record bears out that complaints about the Bisso contract were raised from these quarters in the hearing before the Port Commission's executive committee.

. In the original lease agreement with Ormet, all rules, regulations, tariffs, rates and charges for use of the Burnside terminal were subject to the approval of the Port Commission. By addendum dated January 1, 1992, the Port Commission and Ormet deleted that portion which required the Port Commission's approval.

. I further observe that the end result in the Exxon Corp. case was that competition was encouraged. In the present case, competition is squelched.