Belknap, }
Jan. 7, 1919. }

STATE v. LEE HUTCHINS.

A legislative grant or release of public rights of navigation in favor of a private party will not be inferred because such release would make a private grant more beneficial to the grantee; the incidental power of discontinuing such right cannot be implied from anything less than necessity.

In a legislative grant to A of the right and privilege of maintaining a certain bridge over navigable waters and of continuing any other bridge at the same strait, the act providing that it shall not be lawful for A "to continue any bridge at the place aforesaid so as to prevent the passage of boats, or rafts under the same," there is an express reservation of rights as against the structure then existing, as well as against those thereafter erected.

The term "boats and rafts," as used in such a grant made in 1808, was used in a broad rather than a narrow sense and the legislative intent was to retain the whole of the public right of navigation. A's grant is subject to the right of passage for all craft having reasonable occasion to navigate the strait.

And though such bridge at the date of the grant be only eleven feet above high water, if subsequently the public convenience require a clearance of fifteen feet, the bridge must be raised accordingly.

Where an easement over public waters has been granted by the legislature and the limits thereof are fixed by the grant, no action or failure to act on the part of state officials, other than the legislature, can enlarge the grant or estop the state either wholly or partially to assert the purely public right of navigation.

Where on a bill in equity by the state to abate a public nuisance its existence is established, the decree should be that the nuisance be abated: an order that the state should contribute to its removal is erroneous.

It is immaterial that incompetent evidence has been introduced to establish an incontestable fact.

BILL IN EQUITY, for the abatement of a public nuisance, consisting of a bridge which connects Governor's island with the mainland and obstructs a navigable strait in lake Winnepesaukee. The case was heard by a master whose findings were confirmed by Pike, J., who transferred the case to this court, upon the state's exceptions, from the March term, 1913, of the superior court. It was briefed and argued orally in this court by James P. Tuttle, attorney-general, and Robert L. Manning for the plaintiff, and by Charles B. Hibbard and Walter S. Peaslee, for the defendant. After it had been submitted, it was remanded to the superior court for further proceedings there, because of the discovery of new evidence. The superior court, Sawyer, J., reopened and reviewed the case, heard further evidence, modified and added to the findings made by the master, and trans-

ferred the case from the October term, 1917, of the superior court, upon the state's exceptions.

The facts found were in substance as follows. Nathaniel Davis was the owner of Governor's island (a tract of some 500 acres) and before 1808 had built a bridge over the strait to the mainland in Gilford. This bridge gave a clearance of 11 feet at high water. The legislature of 1808 granted him authority to maintain a bridge there under the limitations quoted in the opinion. At later dates, before 1886, the owners of the island reconstructed the bridge from time to time, and at present it is much lower than in 1808, and prevents the passage of any but small boats. The fill at the ends has been extended so that the present opening is over shallow water, which is not navigable for the larger boats at times of low water. Most of the boats having occasion to pass there would be accommodated by an opening 11 feet above high water, but a few, including the United States mail boat, require an opening of 15 feet. The bridge is a common nuisance.

It was also found "that it would be unreasonable to require the defendant to personally bear the expense of the changes the court has outlined, and that equity and good conscience demand that the state, which has failed to attempt any oversight during the reconstructions of the structure during the past century, should bear one half the expense of such changes, unless it is the legal duty of the defendant to bear them alone."

The decree was "that such bridge be raised to a height of eleven feet above the high water level, and a new opening made therein as hereinbefore suggested (the expense thereof to be borne equally by the state and the defendant) unless the defendant is not required to do so as a matter of law, by reason of the law and the facts herein appearing."

The state excepted to the order for contribution, and to limiting the height to 11 feet.

*Oscar L. Young*, attorney-general (by brief and orally), for the plaintiff.

*Charles B. Hibbard* (by brief and orally), for the defendant.

PEASLEE, J. The state's exception to the refusal to order the raising of the bridge to a height giving fifteen feet clearance above high water, presents the question whether the public right of naviga-

tion in this strait has been granted away by the legislature. If it has not been so granted, the defendant has no right to prevent such navigation. *Conn. River Lumber Co.* v. *Company*, 65 N. H. 290.

The defendant's rights in the premises are based upon an act passed by the legislature in 1808. At that time his predecessor in title, Nathaniel Davis, had constructed a bridge at this place, and petitioned the legislature for authority to maintain the same. The act provides "that the right and privilege of said bridge, and of continuing the same, and of continuing any other bridge at the place where the said bridge is now erected, be and hereby is granted unto and vested in the said Nathaniel Davis his heirs and assigns forever. And be it further enacted that it shall not be lawful for the said Nathaniel Davis his heirs or assigns, to continue any bridge at the place aforesaid, so as to prevent the passage of Boats or Rafts under the same — And said Bridge shall at all times be free for all persons who please, to pass over the same." 7 N. H. Laws, 665.

The defendant contends that this is a grant of a right to maintain the bridge as it was in 1808, and that a permanent right to impede public travel to that extent was conveyed thereby. If this is not so, he further contends that the rights reserved to the state are only for the passage of rowboats and the like, and that as to larger craft the right to prevent travel was conveyed by the grant.

A legislative grant or release of public rights of navigation in favor of private parties is not to be presumed. It will not be inferred because it would make a private grant more beneficial to the grantee. The incidental power of discontinuing such right "cannot be implied from anything less than necessity." *Conn. River Lumber Co.* v. *Company, supra,* 380. There is no necessity in the present case. A bridge can be maintained and still give free passage for the boats desiring to navigate the strait.

If a grant of a right to obstruct navigation could be inferred from the grant of "the right and privilege of said bridge, and of continuing the same," it is distinctly and in terms negatived by what follows. The provision "that it shall not be lawful for . . . Davis . . . to continue any bridge at the place aforesaid, so as to prevent the passage of Boats," is an express reservation of rights as against the structure then existing, as well as against those thereafter erected. The grant is not without limit as to the existing bridge. It conveys the right to maintain the bridge if and so far as it does not infringe upon the rights which are reserved. The legislature were careful to negative the claim that the bridge Davis had built should be the

measure of his rights. They chose to have the public rights remain paramount. It follows that whatever rights are described in the last sentence of the act belong to the public, whether infringed upon by the original bridge or not.

It is urged that this interpretation of the act renders it meaningless, that it leads to the conclusion that rights were granted by the first clause and taken away by the second. But it is by no means certain that Davis had any right as an incident to his title as littoral proprietor to maintain a bridge, even though it did not obstruct public travel. It is manifest that the existence of such right would at least be questionable, and that a legislative grant would be desirable. It is this right which the act grants, and the second clause was added to make sure there should be no claim of an implied grant of a right to obstruct navigation, or that the existing bridge measured the rights conferred.

The language of the act aptly expresses the legislative purpose to retain the public right for use whenever occasion therefor should arise in the future. If there were no boats on the lake, the passage of boats could not fairly be said to be prevented by the bridge. If there were only small boats, a small opening only would be required. But whatever their size, the right of passage for them was retained, and could be asserted whenever the occasion to use it should arise. As before stated, it is the public travel over this public water way which measures the extent to which Davis and his successors were bound to keep the channel free from obstruction by them. The existing structure was legalized so far only as it did not prevent the passage of boats. His rights are similar to those of abutters to temporarily use a land highway. He may exercise them in any way not inconsistent with the needs of public travel. *State* v. *Kean*, 69 N. H. 122, 125.

What was meant by the term "Boats or Rafts"? The defendant concedes that the meaning of the word boat may be broad enough to cover all water craft, but claims that it was here used in a restricted sense, and that it applies only to rowboats and craft of a similar size. Definitions satisfying the claim of either party are to be found in the dictionaries, but we are not left to the expedient of merely choosing between these. There is other and more satisfactory evidence of how the term was understood by the legislators who used it in 1808. From 1792 until the passage of this act in 1808, the legislature granted charters for many canal companies, and from time to time passed acts changing the rates of toll. In these acts the craft plying upon the Merrimack and Connecticut rivers are uniformly described as boats.

The matter of the size of craft is referred to, for the toll is fixed by tonnage. Such expressions as the following abound: "For every boat above one tons burthen," "for every loaded boat three cents per ton," "according to the tons said boats will carry," for every ton "not exceeding five tons: ten cents, for every additional ton of said goods above five, six cents," "for each boat and loading not exceeding two tons weight one dollar, if more than two tons fifty cents for each additional ton," "boats of ten tons burthen." These and similar expressions are found in many different acts which were passed at about the time of the grant to Davis, — three of them at the same session of the legislature.* Their bearing upon the question here is manifest. They afford satisfactory proof that the term was used in a broad rather than a narrow sense, and that the intent was to retain the whole of the public right of navigation.

The enactment of this class of legislation bears upon the issue of legislative intent in other ways. It shows that at the beginning of the nineteenth century the idea was prevalent that the inland waters of the state were to become its great highways for the transportation of freight. The legislative viewpoint as to the use to be made of lake Winnepesaukee is more accurately shown in this way than by the vague and scanty evidence as to what craft were then in actual use. there. The country was undeveloped and sparsely settled. Great advances were expected and planned for. The grant in 1796 of a charter for improving the Upper Merrimack upon condition that the grantees should "render said waters navigable for boats of ten tons burthen to pass up and down from Isle-of-hooksett falls to Winni-pisiokee pond" (6 N. H. Laws, 298, 299), shows that a future commercial use of the lake as a waterway was contemplated before the grant to Davis was made.

In the forty or more bridge charters granted by the legislature before 1809, mention of public rights to navigate the waters to be crossed are found in but four. Two of those were for drawbridges over tidal waters, and the craft to be provided with passage are described as "vessels" (*Piscataqua Bridge Charter*, 6 N. H. Laws, 114, 116), and "vessels and craft" (*Stratham Bridge Charter*, 7 N. H.

---

* *Union Locks & Canal,* (1808) 7 N. H. Laws, 782, 4; *Ib.* 812; *Garvin's Falls Canal,* (1808) 7 N. H. Laws, 654, 6; *Great Ossipee Canal,* (1807) 7 N. H. Laws, 620; *Waterqueechee Falls Canal,* (1805) 7 N. H. Laws, 378, 9; *Ib.* (1796) 6 N. H. Laws, 358, 9; *Webster's Falls Canal,* (1804) 7 N. H. Laws, 271, 3; *Blodgett's Canal,* (1798) 6 N. H. Laws, 524, 6; *Upper Merrimack Canals,* (1796) 6 N. H. Laws, 295, 9; *Isle of Hooksett Canal,* (1794) 6 N. H. Laws, 149, 50; *Bellows Falls Canal,* (1792) 6 N. H. Laws, 69, 71; *Ib.* (1798) *Ib.* 494; *White Falls Canal,* (1792) 6 N. H. Laws, 18, 20.

Laws, 617, 618). Of the other two charters, one was for a bridge over lake Winnepesaukee, and provided that the bridge should not be so built as to "obstruct or prevent the passage of Boats and rafts." *Bagley's Point Bridge Charter*, 7 N. H. Laws, 501, 502. The other was for a bridge over the Merrimack river at Goffe's Falls and provided that navigation by those engaged "in Boating or rafting" should not be impeded or obstructed. *Goffs Ferry Bridge Charter*, 7 N. H. Laws, 728. There is nothing in the language used in these charters to indicate a restrictive use of the word boats in the grant to Davis. Water craft are described as vessels in the charters for bridges over tidal waters, the legislature evidently having in mind the seagoing ships which would have occasion to pass there. But the term is not found in the charters for bridging inland waters. The evidence seems conclusive that it was the legislative custom, at and before the time of the grant to Davis, to treat the term boats as including all craft that navigate the inland waters of the state. It follows that his grant is subject to the right of passage for all craft having reasonable occasion to navigate the strait.

This is the limitation that would reasonably be expected to be put upon a grant like his. If this had been a charter for building a new bridge, and no mention had been made therein of navigation rights, those rights would have remained in the public. *Conn. River Lumber Co. v. Company*, 65 N. H. 290, 389. This was the situation as to nearly all the bridge charters that had been granted, and the remainder were in terms made subject to the right of navigation. In none of them is a grant of a right to obstruct navigation to be found. When a grant of the right to continue a bridge that had been built without authority was sought, it was the natural and reasonable thing to make sure that the grant was so worded that the grantee should not gain rights not conferred upon others. It would be an anomalous situation if Davis' unauthorized act in building his bridge before legislative sanction therefor was obtained should be the means of his thereafter acquiring a grant of extraordinary rights. "There is a natural presumption that if the legislature intended to do this, their purpose will be distinctly expressed." *Conn. River Lumber Co. v. Company, supra*, 388.

The finding of the court is that the bridge is a common nuisance, that to afford a reasonable passage for most of the boats desiring to pass there it must be raised to the height of eleven feet above high water, and that to accommodate the remaining boats it must be raised to a height of fifteen feet. The order that it be raised only to

the lesser height is a denial of the right of the larger boats to navigate the strait. This order is apparently based upon the theory that the height of the original bridge (eleven feet) is of controlling effect. No other reason is suggested for so fixing the limit. But as before pointed out, the limit of the defendant's right is determined by the nature and extent of the public travel on the water. As there is occasion in the course of such travel to use the open space up to fifteen feet above the water, the bridge must be raised so as to give such an opening.

If there is a *bona fide* demand for a use of the public right of navigation, the subordinate private right to maintain the bridge must give way. The question is not settled by a finding as to the comparative money value or utility of the two conflicting uses. "The reduction of the highway from one measured by the power of the undiverted stream to carry logs over the unobstructed falls, to one measured in each particular case, or, in this case, by an appraisal of the logging and manufacturing interests, is a piece of legislation that cannot be inferred from the fact that the statutes contain no allusion to so extraordinary an alteration." *Conn. River Lumber Co.* v. *Company*, 65 N. H. 290, 385. "The entire natural capacity" of the lake for flotation is public property; and boat owners, "as travellers on a highway, are entitled to a reasonable and careful use of that estate." *Ib.* 392.

The decree also orders that the opening for the passage of boats be constructed at a point some distance from the present one, so as to afford sufficient depth of water for the boats of larger draft. The defendant objects to this part of the order, and presents computations to show that there was a causeway at this point in 1808. So far as appears, the defendant took no exception to the decree or to the findings, and the question does not appear to be open to him now. But if it were, it would be disposed of by what has already been said as to the meaning of the grant to Davis and the extent of the public right of navigation. The fact, if proved, that the original bridge obstructed travel is not a defence to a proceeding for its removal.

There was also an order that the state pay one half the expense of the changes "unless it is the legal duty of the defendant to bear them alone." This decree is based upon a finding that the state's failure to oversee the operations of the defendant and his predecessors for one hundred years makes it equitable that the state should pay for the removal of their encroachments on the public right. There is no finding or suggestion that the state has actively misled the defendant into making expenditures. The most that can be said is that he may

have thought that it would not object to his encroachments. But even this is not found. The whole theory of the decree for contribution rests upon the proposition that it was the duty of the state to oversee the defendant's operations; and that if it did not do so the burden of removing the obstruction would be transferred from the defendant to the public.

It will be seen that the real basis of this theory is that there is something in the nature of an estoppel against the state, that it has so conducted that it cannot now deny the lawfulness of the situation it has permitted, except upon compliance with the terms imposed. This presents the question whether mere failure to act, on the part of the state, will estop it, either wholly or partially, to assert the purely public right of navigation. The question is not a doubtful one in this jurisdiction.

The case presented is that of a grant by the legislature of an easement over public waters. The limits of the right are fixed by the grant. No act, or failure to act, on the part of state officials could enlarge it. The public rights in public waters cannot be alienated, or made subject to easements, except by legislative action. *Conn. River Lumber Co.* v. *Company*, 65 N. H. 290, 386, 388; *Concord Mfg. Co.* v. *Robertson*, 66 N. H. 1, 6, 7, 12. They cannot be lost by mere neglect to assert them. They cannot be prescribed against. *State* v. *Company*, 49 N. H. 240, 252. The rule here is not subject to exception. "In this state, the law of public waters being what justice and reason require, there is no exceptional power of invading the public right by prescription." *Concord Mfg. Co.* v. *Robertson*, 66 N. H. 1, 22. It applies as well to public rights in small streams, the bed of which is owned by the abutters. *Collins* v. *Howard*, 65 N. H. 190.

The reason given for the rule that the public rights cannot be lost by showing a claim of right against them, and acquiescence therein for twenty years, is because there is no one whose especial duty or interest it is to take upon himself to make, in behalf of the public, the protest necessary to prevent the running of the statute. *State* v. *Company, supra.* This is one reason why the state is not here estopped to assert its full right. There was no one whose duty it was to speak and to object to the course pursued by the owners of the island. The reasoning of the cases holding that the state's rights in public waters cannot be prescribed against, is conclusive that these rights cannot be conveyed or impaired by an estoppel growing out of mere failure to object to encroachments.

One claiming against such rights proceeds at his peril if he does not

procure an authoritative definition of his rights in advance. When his right is determined by the doctrine of reasonable use, if he proceeds "without a decree or judgment on the question of reasonable use, the abutter assumes the risk of his construction of a wharf, warehouse, weir, tide-mill, or other thing, below the water's edge, being found to be unreasonable, and his structure being an abatable nuisance." *Concord Mfg. Co.* v. *Robertson, supra,* 20.

Apart from the ideas of sovereignty and the impersonal nature of the body politic, which prevent the loss of rights by non-action of the state, there is another reason why there can ordinarily be no estoppel *in pais* against public rights. The argument in *State* v. *Company,* 49 N. H. 240, 252, that there is no one whose especial duty it is to object to encroachments, states but part of the case for the public. Underlying that, and much more fundamental in its character, is the proposition that there is no one (save the legislature) who has authority to convey away such rights. Those who have not the power to transfer rights by a direct conveyance, cannot accomplish that result by indirection. The lack of power to convey is as fatal to a transfer by estoppel or waiver as to one by deed. "Want of legal capacity cannot be supplied by estoppel." *Penacook Savings Bank* v. *Sanborn,* 60 N. H. 558, 561; *Farmington National Bank* v. *Buzzell,* 60 N. H. 189; *Parsons* v. *Rolfe,* 66 N. H. 620. Nor is the attempt to act a waiver of disability. *Bergeron* v. *Bank,* 63 N. H. 195.

Not only was there no official whose duty it was to act as the representative of the state in applying or interpreting the grant, but no one had the power to take such action. There was no one authorized to bind the state by any stipulation as to how the privilege should be exercised. The defendant had no right to rely upon the silence of state officials, because no one but the legislature represented the state in that matter. He was bound to know that there was no one to object, and hence cannot treat want of objection as a basis for an inference of consent because of silence.

It is therefore immaterial whether the defence applied in the superior court is called an estoppel, or laches, or a waiver. Each of these depends for its applicability, in the present instance, upon conduct *in pais* whereby a public right was held to have been impaired. It is settled that no conduct short of legislative action can impair the public rights of navigation. A denial of this proposition cannot be sustained by calling it by one name rather than by another.

Argument has been presented upon the question whether the state can be guilty of laches. The question does not arise here except so

far as the doctrine of laches is applied to cases involving an equitable estoppel; and beyond that it need not be considered. The ground for the decree for contribution by the state is that the state's failure to instruct the defendant's predecessors as to how they should rebuild makes the state in a measure (but not wholly) responsible for the existence of the nuisance. The ruling would be no different if the bill had been filed immediately after the bridge was reconstructed. It is not because the state's claim was stale, but because it was thought that the state had by its inequitable silence induced or permitted the defendant's predecessors to act, that full relief was denied, or made conditional, by the decree.

Remarks in State v. Railroad, 75 N. H. 327; 341, are relied upon to sustain the proposition that laches may be set up as a defence to an equitable proceeding brought by the state. That was a proceeding to enjoin the present and future collection of unauthorized rates. The statement that "if the state were seeking equitable relief as to acts done five years ago, its delay in instituting proceedings for such a length of time might be regarded as laches precluding it from relief," was not necessary to the decision. No such situation was presented, and the question was not decided. The case is not to be regarded as authority for the proposition that the state may be charged with laches. That part of the opinion which decides the question there raised is suggestive of the true rule as to waiver, laches, or estoppel against the state, so far as those defences are involved in this case. "The statute which the defendants are charged with violating has not been repealed, and nothing short of the passage of an act by the legislature, either expressly or by implication repealing it, could preclude the state from insisting upon its enforcement in respect to present or future acts." Ib. Under this rule the railroad would not be permitted to acquire a vested right to charge the excessive rates, by building up an expensive system in reliance upon the state's acquiescence in the illegal rates. As to present and future acts, the public right could not be cut off without legislative action. So here, no matter how much the defendant may have expended in illegally erecting his bridge (and conceding for the sake of the argument that the state's right to complain of past obstruction is barred), still, as to the future, the state's title is unimpaired, and it can of right demand that hereafter he refrain from impeding public travel on the lake.

In another aspect, the order for contribution is erroneous. The bridge is found to be a public nuisance, and the legal conclusion from

this is that the nuisance should be abated. But equitable relief from this consequence is afforded to the defendant by permitting him to rebuild the bridge so that it will not be a nuisance. That is, rebuilding the bridge is a form of relief granted to the defendant and not to the state. As it is for his benefit, a price for it cannot be imposed upon the state. An order that the nuisance abate is all that the state desires, and all that is for its benefit.

The defendant has the rights granted to his predecessor, and no more. He and his predecessor exceeded these rights, and appropriated a use that was not granted. There has been no legislative grant of the excess, or legislative recognition of the defendant's right thereto. It therefore follows that it is his legal duty to abate the nuisance, and the order that the state contribute to the expense of rebuilding the bridge must be set aside.

If the situation is such that some relief should be granted to the defendant by contribution or the cession to him of public rights, his remedy is to apply to the legislature for it. The whole question is one peculiarly within the jurisdiction of that branch of the government. Courts have no power to infringe upon that jurisdiction by affixing conditions to a decree to which the state is entitled under the law.

At the hearing before the master, the state called attention to Laws 1907, chapter 161, in which the bridge is declared to be a nuisance and the attorney-general is directed to take proceedings for the removal of the bridge, or its reconstruction so that the public right of navigation shall be restored. The defendant excepted. At the trial before the court the evidence was "reopened and reviewed," and the parties introduced further evidence. The defendant now claims the benefit of this exception. It does not appear that the court considered this act as evidence on the question of whether the bridge was a nuisance nor that the defendant renewed his objection thereto at the last trial. But however this may be, and conceding that the defendant may now be in a position to claim the exception, the result will not be affected. Upon the undisputed evidence the bridge prevents the general navigation of the strait. The legal conclusion from this being that it is a nuisance, it is immaterial that incompetent evidence may have been introduced to prove an incontestable fact. The act does not undertake to declare the extent to which alterations must be made, and that was the only substantial and material question of fact litigated. If the admission of the act was erroneous it was also harmless, and affords no ground for ordering a new trial.

The decree of the superior court should be modified by striking out the order for contribution by the state, and by increasing the height to which the bridge is to be raised from eleven feet to fifteen feet.

*Plaintiff's exceptions sustained: defendant's exceptions overruled.*

All concurred.