## DAVIS v. UNITED STATES.

### No. 12414.

United States Court of Appeals
Ninth Circuit.

Dec. 11, 1950.

Writ of Certiorari Denied Feb. 26, 1951.

Clifton Hildebrand, Oakland, Cal., for appellant.

Frank J. Hennessy, U. S. Atty., C. Elmer Collett and Antoinette E. Morgan, Asst. U. S. Attys., all of San Francisco, Cal., for appellee.

Before MATHEWS, STEPHENS and ORR, Circuit Judges.

STEPHENS, Circuit Judge.

The appellant, having been convicted in the District Court of violating Section 526l, Title 46 U.S.C.A. The Motorboat

Act of 1940, claims reversible error for the reasons (1) that the District Court had no jurisdiction of the subject matter because the act charged occurred on waters not subject to the jurisdiction of the United States, and (2) that the trial court instructed the jury that the waters of Lake Tahoe (the waters in suit) constitute navigable waters of the United States instead of submitting that issue to the jury as one of fact.

The Motorboat Act of 1940 is titled:[1] "An Act to amend laws for preventing collisions of vessels, to regulate equipment of certain motorboats on the navigable waters of the United States, and for other purposes." and provides that:[2] "No person shall operate any motorboat or any vessel in a reckless or negligent manner so as to endanger the life, limb, or property of any person." and provides for penalties for the violation of this command.[3]

Article I, § 8, Clause 3, of the United States Constitution provides: "The Congress shall have Power * * * To regulate Commerce * * * among the several States * * *."

Article III, § 2, Clause 1, of the United States Constitution provides: "The judicial Power shall extend * * * to all Cases of admiralty and maritime Jurisdiction; * * *".

It is appellant's view that the Motorboat Act of 1940 derives sanction under the admiralty and maritime jurisdictional clause of the Constitution rather than under the commerce clause thereof, and that the Motorboat Act of 1940 does not apply to any body of water which is not connected with the sea. It is admitted that Lake Tahoe has no outlet to the sea.

The Motorboat Act of 1940 amended the Motor Boat Act of 1910.[4] Both were placed under the administration of the Secretary of Commerce[5] and the 1940 Act provided for supervising inspectors who should provide regulations under approval of the Secretary of Commerce, and that the Secretary should establish regulations for the enforcement of its provisions by officers authorized to enforce the navigation laws of the United States.[6]

Chief Justice Hughes for the Supreme Court said in Kelly v. State of Washington, 1937, 302 U.S. 1, 58 S.Ct. 87, 89, 82 L.Ed. 3. "* * * It cannot be doubted that the power of Congress over interstate and foreign commerce embraces the authority to make regulations for respondents' tugs * * * Has Congress exercised that authority and, if so, to what extent?

"The federal acts and regulations with respect to vessels on the navigable waters

---

1. 54 Stat. 163.

2. 46 U.S.C.A. § 526l; Act of Apr. 25, 1940, c. 155, § 13, 54 Stat. 166.

3. 46 U.S.C.A. § 526m, Act of Apr. 25, 1940, § 14, 54 Stat. 166. In United States v. Ross, D.C.Mo.1947, 74 F.Supp. 6, defendant was charged with violation of this statute. Soil had been taken from beside the Mississippi River to build a levee, leaving a "borrow pit" beside the river, extending for several miles and varying in width from 50 to 200 feet. There were two openings from the "borrow pit" to the river, which permitted passing from the borrow pit to the river by use of an oar or pole. The maximum depth of the borrow pit was 6 or 7 feet. Defendant maintained a dock on this "borrow pit" and during the duck hunting season carried duck hunters in a small boat to an island in the Mississippi River. The death of three duck hunters occurred when the boat sank on one such trip, resulting in the charge. The district court held that it lacked jurisdiction over the subject matter because the acts complained of did not take place on the navigable waters of the United States.

4. Act of June 9, 1910, c. 268, 36 Stat. 462, 46 U.S.C.A. § 511 et seq.

5. Act of June 9, 1910, c. 268, § 8, 36 Stat. 463, 46 U.S.C.A. § 518; Act of Apr. 25, 1940, c. 155, § 17, 54 Stat. 166, 46 U.S.C.A. § 526p. Although the original enactment of the Motor Boat Act of 1910 referred to "Secretary of Commerce and Labor" and "Department of Commerce and Labor," the Act of March 4, 1913, c. 141, 37 Stat. 736, provided that the Department of Commerce and Labor should thereafter be called the Department of Commerce, and that the Secretary thereof should be called the Secretary of Commerce.

6. These functions were later transferred to the Commandant of the Coast Guard under the 1946 Reorganization Plan, 11 F.R. 7875, 60 Stat. 1097, 5 U.S.C.A. §§ 133y to 133y—16 note.

of the United States are elaborate. They were well described in the argument of the Assistant Solicitor General as a maze of regulation. Provisions with respect to steam vessels are extremely detailed * * Provisions as to motor-driven vessels are far less comprehensive and establish only a limited regulation * * *

"In 1910, Congress enacted the Motor Boat Regulations Act * * *".

We take the following from the Congressional Record:

[7] "Mr. Vandenberg. Mr. President, Calendar No. 728, Senate Bill 2259, to amend laws for preventing collisions of vessels, to regulate equipment of certain motorboats on the navigable waters of the United States, and for other purposes, which is the same as Calendar No. 898, a House bill on the same subject, (the statute in suit) has been on the calendar since June last. It is a Department of Commerce measure.

[8] "Mr. King. Let me inquire of the Senator from Michigan whether the chairman of the Committee on Commerce is favorable to this substitution?

"Mr. Vandenberg. All the authorities involved are in agreement—the chairman of the Committee on Commerce, the Department of Commerce, and all others who are interested * * *".

■ In the exercise of its commercial power, Congress may enact (quoting from The Daniel Ball, 1870, 10 Wall. 557, at 564, 77 U.S. 557 at 564, 19 L.Ed. 999) "* * * all appropriate legislation for the protection or advancement of either interstate or foreign commerce, *and for that purpose such legislation as will insure the convenient and safe navigation of all the navigable waters of the United States,* whether that legislation consists in requiring the removal of obstructions to their use, in prescribing the form and size of the vessels employed upon them, or in subjecting the vessels to inspection and license, in order to insure their proper construction and equipment. The power to regulate commerce,' this court said in Gilman v. Philadelphia, 'comprehends the control for that purpose, and to that extent necessary, of *all navigable waters of the United States which are accessible from a State other than those in which they lie.* For this purpose they are the public property of the nation, and subject to all the requisite legislation of Congress.' "(Emphasis ours.)

■ It is our view that the statute under consideration was passed as a commerce measure under the commerce clause of the Constitution.

Title 18 U.S.C.A., 3231, provides:

"The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.

"Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof."

■ We conclude that the district court had jurisdiction in this case under Section 526*l* of the Motorboat Act of 1940, if the waters of Lake Tahoe are navigable waters of the United States.

In Law v. Smith, 9 Cir., 1923, 288 F. 7, at page 9, this court took judicial notice of the fact that Lake Tahoe is in the Sierra Nevada Mountains, that it is about 21 miles long and from 8 to 12 miles wide, and lies at an altitude of about 6225 feet above sea level. We also know that the lake is transected lengthwise by the California-Nevada state border.

F. W. Brenzel, witness for the prosecution, was the only witness produced at the trial to testify as to the use and natural features of the lake. He testified to the following effect: The "Tahoe" and other boats, for several years prior to around 1943, carried mail, provisions and passengers around the lake, contacting points on the Nevada and on the California sides. Sightseeing boats still operate on the lake, contacting points in both states, however carriage of mail and articles of commerce has virtually ceased. While the depth of the lake varies, it has a depth of about 1200 feet at its deepest point.

7. 86 Congressional Record, Part 3, p. 3314.

8. 86 Congressional Record, Part 4, p. 4236.

We go to The Daniel Ball, supra,[9] for light on the issue of navigable waters of the United States. " * * * Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water."

▋▋ In United States v. Appalachian Power Co., 1940, 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243, the definition applied in The Daniel Ball was extended. The Court stated 311 U.S. at page 407, 61 S.Ct. at page 299, 85 L.Ed. 243:

"To appraise the evidence of navigability on the natural condition only of the waterway is erroneous. Its availability for navigation must also be considered. 'Natural or ordinary conditions' refers to volume of water, the gradients and the regularity of the flow. A waterway, otherwise suitable for navigation, is not barred from that classification merely because artificial aids must make the highway suitable for use before commercial navigation may be undertaken * * *".

The Supreme Court case just quoted from reversed the finding of the District Court, affirmed in the Court of Appeals, to the effect that New River, the body of water in question, was not a navigable water of the United States. The decisions on the subject were exhaustively reviewed, and no useful purpose would be served by further elaboration of past authority on the subject, other than to mention a few of the principles particularly applicable to the instant case.

▋▋ Quoting further from the Appalachian Power Co., case,[10] it is said:

"Nor is it necessary for navigability that the use should be continuous. The character of the region, its products and the difficulties or dangers of the navigation influence the regularity and extent of the use. *Small traffic compared to the available commerce of the region is sufficient. Even absence of use over long periods of years, because of changed conditions, the coming of the railroad or improved highways does not affect the navigability of rivers in the constitutional sense.* It is well recognized too that the navigability may be of a substantial part only of the waterway in question. Of course, these evidences of nonnavigability in whole or in part are to be appraised in totality to determine the effect of all. With these legal tests in mind we proceed to examine the facts to see whether the 111-mile reach of this river from Allisonia to Hinton, across the Virginia-West Virginia state line, has *capability of use by the public* for purposes of transportation and commerce.'" (Emphasis ours.)

The old doctrine of the common law which, in England, limited the navigable waters to those within the ebb and flow of the tide was rejected as a limitation on the commerce power in The Daniel Ball, supra, as having nothing to do with and having no limitation on the commerce clause of the Constitution.

▋ It seems to us that the requirement of an outlet to the sea may be eliminated as unnecessary to federal jurisdiction under the commerce power for the same reasons. Congress is no more limited in the exercise of this power conferred by the Constitution by the fact that nature did not provide a large body of water with an outlet to the sea, than it is by the fact that the water is affected by the attraction of the moon and the sun. Federal power rests upon more practical considerations.

▋ Lake Tahoe is a navigable body of water of the United States, if it is used,

---

9. 10 Wall at page 563, 77 U.S. at page 563, 19 L.Ed. 999.

10. 311 U.S. at page 409, 61 S.Ct. at page 300, 85 L.Ed. 243.

or is susceptible of being used, in its ordinary condition, or with reasonable improvements, as a highway for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. If it forms, by itself or by uniting with other waters, a continued highway over which commerce is or may be carried on with other states or foreign countries in the customary modes in which such commerce is conducted by water, it falls within the scope of federal jurisdiction. The Daniel Ball, supra; the Montello, 1874, 20 Wall. 430, 87 U.S. 430, 22 L.Ed. 391; United States v. Appalachian Power Co., supra.

■ The Great Lakes have been held to be navigable waters of the United States and to fall within the sovereign power of the United States to regulate commerce. Sanitary District of Chicago v. United States, 1925, 266 U.S. 405, 45 S.Ct. 176, 69 L.Ed. 352; State of Wisconsin v. State of Illinois, 1929, 278 U.S. 367, 49 S.Ct. 163, 73 L.Ed. 426. The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability, rather than the extent and manner of that use. The Montello, supra. Water having actual navigable capacity in its natural state and capable of carrying commerce among the states, is within the power of Congress to preserve for purposes of future transportation, even though it be not at present used for such commerce. The fact that water has not been used for commercial purposes for a number of years is not controlling. Economy Light & Power Co. v. United States, 1921, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847. " * * * The extent of existing commerce is not the test. The evidence of the actual use of streams, and especially of extensive and continued use for commercial purposes may be most persuasive, but, where conditions of exploration and settlement explain the infrequency or limited nature of such use, the susceptibility to use as a highway of commerce may still be satisfactorily proved. * * *

" * * * The question remains one of fact as to the capacity of the rivers in their ordinary condition to meet the needs of commerce as these may arise in connection with the growth of the population, the multiplication of activities, and the development of natural resources. And this capacity may be shown by physical characteristics and experimentation as well as by the uses to which the streams have been put." United States v. State of Utah, 1931, 283 U.S. 64, 82, 83, 51 S.Ct. 438, 443, 75 L.Ed. 844. See also, United States v. Holt Bank, 1926, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465.

■ We hold the evidence in this case sufficient to support a finding that the waters of Lake Tahoe are navigable waters of the United States.

The trial court charged the jury:

"The court takes judicial notice, and you are to take as an established fact that Lake Tahoe is a navigable body of water under the jurisdiction of the United States of America, and that El Dorado County is within the Northern Division of the Northern District of California, and, so, within the jurisdiction of this court."

■ Whether its geographical jurisdiction covers the place of the occurrence under consideration is a question within the power of the court to determine, and this is true in a criminal as well as a civil case. Jones v. United States, 1890, 137 U.S. 202, 11 S.Ct. 80, 34 L.Ed. 691; United States v. Carrillo, D.C.Cal. 1935, 13 F.Supp. 121. See, also, Gilbert v. David, 1914, 235 U.S. 561, 568, 35 S.Ct. 164, 59 L.Ed. 360; Stoll v. Gottlieb, 1938, 305 U.S. 165, 171, 59 S.Ct. 134, 83 L.Ed. 104.

■ The manner in which such preliminary questions of jurisdiction shall be tried is left to the discretion of the trial judge. Wetmore v. Rymer, 1898, 169 U.S. 115, 18 S.Ct. 293, 42 L.Ed. 682; Gilbert v. David, supra; Murphy v. Campbell Soup Co., D.C. Mass., 1930, 44 F.2d 214. See Leovy v. United States, 1899, 177 U.S. 621, 628, 20 S.Ct. 797, 44 L.Ed. 914. " * * * The case, if it can be avoided, ought not to be decided upon a narrow selection of facts which might determine the question one way, before one jury, to-day, and another way, before another jury, to-morrow * *." Coffee v. Groover, 1887, 123 U.S. 1, 11, 8 S.Ct. 1, 6, 31, L.Ed. 51.

In Jones v. United States, supra, defendant was charged with murder committed in a place which was alleged to be under the sole and exclusive jurisdiction of the United States, namely, the Island of Navassa, in the Caribbean Sea. The defendant was convicted and he moved in arrest of judgment, alleging that the court was without jurisdiction, since the scene of the act charged was not within the territorial jurisdiction of the United States. This motion was overruled and the defendant was sentenced to death. The Supreme Court affirmed this decision. Mr. Justice Gray stated, 137 U.S. at pages 214, 215, 11 S.Ct. at pages 84, 34 L.Ed. 691:

"All courts of justice are bound to take judicial notice of the territorial extent of the jurisdiction exercised by the government whose laws they administer, or of its recognition or denial of the sovereignty of a foreign power, as appearing from the public acts of the legislature and executive, although those acts are not formally put in evidence, nor in accord with the pleadings * * *

"So in Coffee v. Groover, upon writ of error to the Supreme Court of Florida, in a case involving a title to land, claimed under conflicting grants from the state of Florida and the state of Georgia, and depending upon a disputed boundary between those states, this court ascertained the true boundary by consulting public documents, some of which had not been given in evidence at the trial, nor referred to in the opinion of the court below * * *."

■ We may take judicial notice of the principal features of the geography of our country, and, as a part of it, what streams are public navigable waters of the United States. The Montello, supra, 20 Wall. at page 441, 87 U.S. at page 441, 22 L.Ed. 391.

■ This court, as has been mentioned, Law v. Smith, supra, has taken judicial notice of the natural features of Lake Tahoe.

In the present case the basic facts regarding the natural features and use of Lake Tahoe appear not to be seriously in controversy, and there are no questions of credibility between witnesses.

We hold that the trial court did not err in instructing the jury that the waters in question were navigable waters of the United States.

The judgment is affirmed.