STATE OF NEVADA, Appellant, *v.* JULIUS BUNKOW–
SKI, DAVID LANTRY and BRUNSWICK DEVEL–
OPMENT CORPORATION, a Nevada Corporation,
Respondents, TROUT UNLIMITED, Amicus Curiae,
CARSON WATER SUBCONSERVANCY DISTRICT,
Amicus Curiae.

No. 6799

November 29, 1972 503 P.2d 1231

[Rehearing denied December 22, 1972]

*Robert List,* Attorney General, *Michael L. Melner,* Deputy Attorney General, and *Arthur J. Bayer, Jr.,* Deputy Attorney General, Carson City, for Appellant.

*Laxalt, Berry & Allison* and *Stokes & Eck, Ltd.,* of Carson City, for Respondents.

*Breen, Young, Whitehead & Hoy,* of Reno, and *Reno and Judd,* of Denver, Colorado, for Amicus Curiae Trout Unlimited.

*Guild, Hagen & Clark,* of Reno, for Amicus Curiae Carson Water.

## OPINION

By the Court, ZENOFF, C. J.:

This is a land title action brought to remove the State's claim of ownership from certain described property owned by respondents.

Julius Bunkowski and David Lantry are the owners of 946 acres of land in Carson City and Lyon County, of which, in 40 acre parcels, 840 acres are traversed by the Carson River. Seven hundred seventy-seven acres were sold to the Brunswick Development Corporation for development and retrieval of mineralization existing in and about the river bed. The land owned by respondents devolve from ten federal and state patents. Three federal patents were issued prior to Nevada's statehood, the remaining five federal and two state patents were issued subsequent to statehood.

The Carson River is a natural water course having two branches or forks through which water flows every month of the year. The East Fork of the Carson and the tributaries thereof rise from rains, melting snows and springs in the Sierra Nevada Mountains near the town of Markleeville, Alpine County, California, whence they flow in a generally northerly direction into Douglas County, Nevada, through Carson Valley to a point in Carson Valley near Walley's Hot Springs where they join with the waters of the West Fork of the Carson River forming the main stream known as the Carson River. The West Fork and its tributaries similarly originate in Alpine County, California, in the vicinity of Hope Valley, whence the flow in a general northerly direction through Woodfords, California, into Douglas County and join with the East Fork of the Carson River. From Walley's Hot Springs the Carson flows in a general northeasterly direction through Douglas, Carson City, Storey and Churchill Counties, Nevada, in which latter county in the natural state the waters of the Carson flow into the Carson Sink and disappear. The entire water course exceeds 100 miles in length.

The lands in question owned by the respondents and traversed by the Carson lie within the Brunswick Canyon area

northeast of Carson City and are adjacent to a three to four mile stretch of the river.

The Attorney General of Nevada, on January 6, 1970, and the Nevada Legislative Counsel, on January 13, 1970, issued opinions that the Carson River is a navigable stream and that the State owns the river bottom thereof. Shortly thereafter the respondents commenced this declaratory relief action in the lower court seeking to clear the alleged cloud from their title. After that the parties stipulated, "That as an historical fact, the Carson River was at one time used for the floating of logs and timber," and, "That the said Carson River is not now nor has it ever been used by cargo or passenger carrying vessels."

All the evidence was heard before a Special Master. Pertinent to the issue before us the evidence showed that the patents from which respondents' title originates made no exception, reservation or exclusion for the portion of the channel lying within the bed of the Carson River. The lands in question have been carried on the tax rolls of Carson City[1] and Lyon County without exclusion of the river bed and taxes have been paid on the total land within the patent calls.

As to the physical condition of the river and its uses the evidence in the main was confined to the early history of the Carson near the time when Nevada became a state (October 31, 1864). Although considerable impediments to commercial use of the river existed, such as willows, sand bars and lack of water, the early history revealed that the river was used by loggers to float logs and timber from the headwaters of the Carson in Alpine County, California, to saw mills near Virginia City. The first log drive occurred in the spring of 1861 and was in the nature of an experiment. Thereafter a group of men procured a franchise from the Legislature of the Territory of Nevada to improve the channel of the Carson River and to float logs down the river. Laws of Nevada Territory 100–01 (1861). Subsequently great quantities of saw logs and cordwood were brought down the Carson to fuel and supply the well-known mining operation and bonanza at Virginia City, Nevada. As described by one witness, the log drives were accomplished in the following manner: "They had to go up into the mountains [in Alpine County] and cut the logs and either drag them or float them on the small streams until they reached the main stream. Then they were floated down the [Carson] river to the entrance of the Carson Valley at Young's Crossing and there they had a [chain] boom and they held the

[1]Carson City now comprises what was once Ormsby County.

logs in great numbers at that point until . . . conditions would be right in the river so that they could float them down."

The log drives continued from the early 1860's for thirty-five years when the loggers found it too expensive to bring the large saw logs from the mountain slopes to the streams forcing them to move to other areas. The floating down of cordwood continued on for a number of years.

Except for the log drives and some dredging for gravel and various aggregates the evidence showed that there has been no other type of commercial activity in the sense of water trade on the Carson River.

The Master, after reviewing the evidence, proceeded to make his finding, viz: "That said Carson River is not in fact or in law now a navigable stream, nor was it in fact or in law a navigable stream on the 31st day of October, 1864, such as to vest title to the stream bed or any portion thereof in the State of Nevada." The lower court adopted the conclusion of the Master and entered its judgment and decree, from which judgment this appeal has been taken.

The principal question in this appeal is whether the State has a valid claim to the bed of the Carson River as it flows across respondents' land. Other subsidiary issues must also be discussed, but first we will set out the appropriate test to resolve the primary issue.

1. In determining the title ownership of lands underlying waters within a state the courts must apply the uniform federal test of navigability, although various state tests of navigability, to be discussed below, exist. The United States Supreme Court stated in United States v. Holt Bank, 270 U.S. 49, 54–55 (1926):

"It is settled law in this country that lands underlying navigable waters within a State belong to the State in its sovereign capacity and may be used and disposed of as it may elect, subject to the paramount power of Congress to control such waters for the purposes of navigation in commerce among the States and with foreign nations, and subject to the qualification that where the United States, after acquiring the territory and before the creation of the State, has granted rights in such lands by way of performing international obligations, or effecting the use or improvement of the lands for the purposes of commerce among the States and with foreign nations, or carrying out other public purposes appropriate to the objects for which the territory was held, such rights are not cut off by the subsequent

creation of the State, but remain unimpaired, and the rights which otherwise would pass to the State in virtue of its admission into the Union are restricted or qualified accordingly. [Citations.] But, as was pointed out in Shively v. Bowlby, [152 U.S. 1,] 49, 57–58, the United States early adopted and constantly has adhered to the policy of regarding lands under navigable waters in acquired territory, while under its sole dominion, as held for the ultimate benefit of future States, and so has refrained from making any disposal thereof, save in exceptional instances when impelled to particular disposals by some international duty or public exigency. It follows from this that disposals by the United States during the territorial period are not lightly to be inferred, and should not be regarded as intended unless the intention was definitely declared or otherwise made very plain." See Brewer-Elliott Oil & Gas Co. v. United States, 260 U.S. 77 (1922); United States v. Utah, 283 U.S. 64 (1931); United States v. Oregon, 295 U.S. 1 (1935); State Engineer v. Cowles Bros., Inc., 86 Nev. 872, 478 P.2d 159 (1970); Utah v. United States, 403 U.S. 9 (1971).

The State of Nevada was admitted into the Union on October 31, 1864 (13 Stat. 30, approved March 21, 1864), and under the constitutional principle of equality among the several states, the title to the bed of the Carson River then passed to the State, if the river was navigable, and if the bed had not already been disposed of by the United States. United States v. Holt Bank, supra, at 55.

Most importantly and basic to the issue of title to the Carson River bed, the following statement of the court in United States v. Holt Bank, supra, at 55–56, must be fully appreciated:

"Navigability, when asserted as the basis of a right arising under the Constitution of the United States, is necessarily a question of federal law to be determined according to the general rule recognized and applied in the federal courts. Brewer-Elliott Oil & Gas Co. v. United States, supra, p. 87. To treat the question as turning on the varying local rules would give the Constitution a diversified operation where uniformity was intended."

To restate it, so that all states when admitted to the Union have equal standing a uniform federal test to title of watercourse beds must be maintained. True it is that many states have adopted varying and less stringent tests than the federal test in order to establish the right of public use in certain watercourses. For example, in California it has been held in People v. Mack, 97 Cal.Rptr. 448, 454 (Cal.App. 1971), that, "The

streams of California are a vital recreational resource of the state. The modern determinations of the California courts, as well as those of several of the states, as to the test of navigability can well be restated as follows: Members of the public have the right to navigate and to exercise the incidents of navigation in a lawful manner at any point below high water mark on waters of this state which are capable of being navigated by oar or motor propelled small craft." See also State v. Bollenbach, 63 N.W.2d 278, 287 (Minn. 1954). Reference to People v. Mack, supra, which reviews a substantial number of state navigability cases, illustrates most forcefully that the state courts have not striven for uniformity. For this reason, those state cases are not authority for the determination of state ownership of navigable watercourse beds. Said determination must be made by reference to the uniform federal "navigability for title" test.

That test is stated by the court in United States v. Holt Bank, supra, at 56:

"The rule long since approved by this Court in applying the Constitution and laws of the United States is that streams or lakes which are navigable in fact must be regarded as navigable in law; that they are navigable in fact when they are used, or are susceptible of being used, in their natural and ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water; and further that navigability does not depend on the particular mode in which such use is or may be had— whether by steamboats, sailing vessels or flatboats—nor on an absence of occasional difficulties in navigation, but on the fact, if it be a fact, that the stream in its natural and ordinary condition affords a channel for useful commerce. The Montello, 20 Wall. 430, 439; United States v. Cress, 243 U.S. 316, 323; Economy Light & Power Co. v. United States, 256 U.S. 113, 121; Oklahoma v. Texas, 258 U.S. 574, 586; Brewer-Elliott Oil & Gas Co. v. United States, supra, p. 86."

Considering briefly the evidence adduced before the Master, it appears that the log drivers encountered difficulty in conducting their drives because of the irregular flow and unchannelized nature of the river in the Carson Valley. Respondents contend that these impediments to commercial use preclude a holding of navigability. As will be shown, that is not the case.

In the United States Supreme Court cases which discuss navigability, a distinction must be made, as suggested in R. Johnson & R. Austin, Jr., Recreation Rights and Titles to Beds on Western Lakes and Streams, 7 Nat. Res. J. 1, 15 (1967),

between "navigability" for land title and "navigability" for Federal Commerce Power.

A. For the Commerce Test, the court held that impediments to commercial use, such as those noted above, do not destroy navigability. For example, in Economy Light & Power Co. v. United States, supra, at 122, where the issue concerned a dam to be built on the Desplaines River in Illinois the court stated: "Navigability, in the sense of the law, is not destroyed because the watercourse is interrupted by occasional natural obstructions or portages; nor need the navigation be open at all seasons of the year, or at all stages of the water . . ."

In The Montello, 20 Wall. [87 U.S.] 430, 441–42 (1874), it was said:

"The true test of the navigability of a stream does not depend on the mode by which commerce is, or may be, conducted, nor the difficulties attending navigation. If this were so, the public would be deprived of the use of many of the large rivers of the country over which *rafts of lumber* of great value are constantly taken to market.

"It would be a narrow rule to hold that in this country, unless a river was capable of being navigated by steam or sail vessel, it could not be treated as a public highway. The capacity of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use. If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or highway." (Emphasis added.)

In another Federal Commerce case, United States v. Appalachian Power Co., 311 U.S. 377 (1940), the court stated in the course of its opinion (at 405–10):

"It is obvious that the uses to which the streams may be put vary from the carriage of ocean liners to the *floating out of logs;*[2] that the density of traffic varies equally widely from the busy harbors of the seacoast to the sparsely settled regions of the Western mountains. The test as to navigability must take these variations into consideration.

". . .

"To appraise the evidence of navigability or the natural condition only of the waterway is erroneous. Its availability for

---

[2]This court recognized the floating of logs and timber as commerce in Shoemaker v. Hatch, 13 Nev. 261, 267 (1878). See also Nekoosa Edwards Paper Co. v. Railroad Commission, 228 N.W. 144 (Wis. 1929).

navigation must also be considered. 'Natural and ordinary conditions' refers to volume of water, the gradient and the regularity of the flow. A waterway, otherwise suitable for navigation, is not barred from that classification merely because artificial aids must make the highway suitable for use before commercial navigation may be undertaken.

"...

"In determining the navigable character of the New River it is proper to consider the feasibility of interstate use after reasonable improvements might be made.

"Nor is it necessary for navigability that the use should be continuous. The character of the region, its products and the difficulties or dangers of the navigation influence the regularity and extent of the use. Small traffic compared to the available commerce of the region is sufficient. Even absence of use over long periods of years, because of changed conditions, the coming of the railroad or improved highways does not affect the navigability of rivers in the constitutional sense." (Emphasis added.)

Applying the above rules to the facts stated above, it would appear that neither the impediments to navigation existing in the Carson nor the improvements in aid of navigation would preclude a finding of navigability under federal commerce power.

B. The Title Test. In addition to the commerce test a further condition to title navigability was made in United States v. Oregon, supra, at 23, that the watercourse must be geographically situated so that it may be useful for commerce. See also State v. Bollenbach, supra, at 289. This condition is met here.[3]

Although no Supreme Court case has expressly based its decision of title navigability on the capacity of a stream to float out logs, the emphasized portions of the quotation from The Montello and Appalachian Power leads us to believe that in the setting of this case navigability for title has been established.

---

[3]In one title case, United States v. Utah, 283 U.S. 64, 84 (1931), the court quieted title in Utah to certain portions of the beds of the Green, Colorado and San Juan Rivers within the State of Utah, despite assertions that impediments to commercial use such as "logs and debris, ice, floods, rapids, and riffles in certain parts, rapid velocities with sudden changes in the water level, sand and sediment which combined with the tortuous course of the rivers, produce a succession of shifting sand bars, shallow depths, and instability of channel," would preclude a finding of title navigability.

Log driving was the first and apparently only important commercial use of the Carson.[4] The river was fortuitously and ideally located geographically for this use. The Carson River was and is navigable.[5]

2. Do the state courts have jurisdiction to apply the federal navigability test?

No case has been found which holds that there is exclusive federal jurisdiction to determine title navigability. The federal "question" appearing in the cases refers to the uniform federal "test" which is not used in the jurisdictional sense, State of South Carolina v. South Carolina E. & Gas Co., 41 F.Supp. 111 (E.D.S.C. 1941), but, on the contrary, has been applied by both state and federal courts to determine title to submerged lands. One of the best state cases applying the federal title test is Sate v. Bollenbach, 63 N.W.2d 278 (Minn. 1954). For a compilation of state court decisions applying the federal test see Appendix to R. Johnson & R. Austin, Jr., supra, 7 Nat. Res. J. 1, 52 (1967). Although the Carson is an interstate watercourse, this action only relates to a portion of it lying solely within this court's jurisdiction.

3. Next we must consider the effect of the federal and state patents. Respondents claim title through ten patents; of these, two are state patents issued after statehood, eight are federal patents of which three were issued prior to statehood.

As to the prestatehood federal patents, it is to be noted that there is no express reservation of title to the river bed, all described land is granted without reservation. In Wear v. Kansas, 245 U.S. 154 (1917), the patent of the United States under which Wear derived title was a grant, made before statehood, of land bordering on the Kansas River without restriction, reservation or expansion. The state supreme court took

---

[4]Reference is made to a booklet entitled, "ALONG COMSTOCK TRAILS FEATURING THE CARSON RIVER MILLS AND THE VIRGINIA & TRUCKEE RAILROAD," by Dave Basso, found in the Carson City Library, N, F847, C6, B3, c.2. This publication features a series of early Nevada pictures of several quartz mills along the Carson River built in the 1860's and 1870's. Very evident in the picture is the ample supply of water in the Carson River.

[5]Technically the evidence presented to the Master established that the northern terminus of the log drives was the Russell Mill at Empire which is upstream from the property in question. We will assume for the purposes of this decision that the logs would have continued to float downstream if they were not restrained at the mill.

judicial notice of the navigability of the river, refused to hear evidence thereon and held that the patent to land on a navigable stream did not convey the bed of the river. The United States by its unrestricted patent was properly taken to have assented to its construction according to the local law. Further, in Hardin v. Jordan, 140 U.S. 371, 384 (1891), the court stated the applicable rule as to unrestricted patents in the following manner:

"We do not think it necessary to discuss this point further. In our judgment the grants of the government for lands bounded on streams and other waters, without any reservation or restriction of terms, are to be construed as to their effect according to the law of the State in which the lands lie."

Therefore, by application of this rule we are free to construe the unrestricted federal and state patents by the same criterion. Considering the prestatehood federal patents, the following statement in United States v. Oregon, supra, at 14, seems appropriate:

"Dominion over navigable waters and property in the soil under them are so identified with the sovereign power of government that a presumption against their separation from sovereignty must be indulged, in construing either grants by the sovereign of the lands to be held in private ownership or transfer of sovereignty itself. See Massachusetts v. New York, 271 U.S. 65, 89. For that reason, upon the admission of a State to the Union, the title of the United States to lands underlying navigable waters within the States passes to it, as incident to the transfer to the State of local sovereignty, and is subject only to the paramount power of the United States to control such waters for purposes of navigation in interstate and foreign commerce."

There is nothing in the record or to our knowledge which would rebut the presumption that the federal government held the subject lands in trust for the State of Nevada.

After statehood, the river being navigable and the bed thereof owned by the State, the federal government did not have control over the bed, and it would appear obvious that the federal patents conveyed none of the submerged lands.

As to the state patents, again, without reservation, it is clear that the State owned the land to do with as it might. "It is settled law in this country that lands underlying navigable waters within a State belong to the State in its sovereign

capacity and may be used and disposed of as it may elect. . . ." United States v. Holt Bank, supra, at 54.

It has been held, in what appears to be a majority of cases, that the states hold title to the beds of navigable watercourses in trust for the people of their respective states. Hillebrand v. Knapp, 274 N.W. 821, 822–23, 112 A.L.R. 1104 (S.D. 1937); Annot. Title to beds of natural lakes and ponds, 112 A.L.R. 1108 (1938); Menzer v. Village of Elkhart Lake, 186 N.W.2d 290 (Wis. 1971); City of Long Beach v. Mansell, 476 P.2d 423 (Cal. 1970); J. Sax, The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention, 68 Mich.L.Rev. 473 (1970). Titles to navigable water beds are normally inalienable. Miami Corporation v. State, 173 S. 315 (La. 1936). In Alameda Conservation Association v. City of Alameda, 70 Cal.Rptr. 264 (Cal.App. 1968), it was held that while the state owns land under bays, such lands can be transferred by the state free of trust upon proper legislative determination, citing People v. California Fish Co., 138 P. 79 (Cal. 1913). See Marks v. Whitney, 491 P.2d 374 (Cal. 1971). No such express legislative determination has been revealed here, consequently, the State, as sovereign, did not grant away the public land of the river bed.

4. Respondents assert in their answering brief that the list of legislative declared navigable waters in NRS Chapter 537 is exclusive and that since the Carson does not there appear, it is not navigable. First, as to the question of navigability, this court held in State Engineer v. Cowles Bros., Inc., 86 Nev. 872, 876 (1970), that the issue of navigability is a judicial question, the "statement in the statutes therefore served no purpose." Accord, People v. Mack, 97 Cal.Rptr. 448, 453 (Cal. App. 1971). Second, Chapter 537 is not a complete list as it omits Lake Tahoe which was held navigable in Davis v. United States, 185 F.2d 938, 942–43 (9th Cir. 1950).

5. For not asserting its ownership of the Carson River bed earlier respondents contend that the State is now estopped to claim title thereto.

"The doctrine of estoppel should not be lightly invoked against the state. It will not be applied against it in its . . . sovereign capacity." Annot., Applicability of doctrine of estoppel against government and its governmental agencies, 114 A.L.R.2d 344 (1948). In State v. Hutchins, 105 A. 519, 523 (N.H. 1919), the court held that the public rights in public

waters cannot be alienated or made subject to easements except by legislative action; neither can the state's right in public waters be prescribed against nor can these rights be impaired by an estoppel growing out of a mere failure to object to encroachment. See State v. George Staffords & Sons, 105 A.2d 569, 573 (N.H. 1954).

The State holds the subject lands in trust for public use. Judgment reversed.

BATJER, MOWBRAY, THOMPSON, and GUNDERSON, JJ., concur.